Joe and Victoria MORRONE, Individually and as Next Friend of Emma Morrone, a Minor Child, Appellants,

v.

PRESTONWOOD CHRISTIAN ACADEMY and Robyn Gale Pryor,[1] Appellees.

No. 11–05–00270–CV.

Court of Appeals of Texas, Eastland.

Feb. 15, 2007.

Rehearing Overruled March 15, 2007.

1. We note that in the briefs and judgment in this case Pryor's first name is spelled as "R-o-b-y-n" and as "R-o-b-i-n." Because she used the former in her brief, we will also spell the name "Robyn." The same is true as to the spelling of "Gale."

Bill Liebbe, William Araiza, Law Office of Bill Liebbe, P.C., Tyler, Charles W. McGarry, Law Office of Charles W. McGarry, Dallas, for appellants.

A. William Arnold III, Christopher D. Freeman, A. William Arnold III & Associates, P.C., Dallas, C. John Scheef III, J. Mitchell Little, Scheef & Stone, L.L.P., Frisco, for appellees.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

JIM R. WRIGHT, Chief Justice.

Joe Morrone and his wife, Victoria, for themselves and as next friends of Emma Morrone, their daughter, sued Prestonwood Christian Academy and Emma's kindergarten teacher, Robyn Gale Pryor. They sought damages allegedly resulting from Pryor's verbal and emotional abuse directed at Emma and at other students in Emma's presence. Prestonwood and Pryor filed a counterclaim for "Defamation–Slander *Per Se*" against the Morrones. They also sued Brenda Kaye Caldwell, a former teacher's aide at Prestonwood. All parties filed motions for summary judgment. The trial court entered an agreed order of dismissal of the claims made by Prestonwood and Pryor against Caldwell. The trial court granted the motions for summary judgment and ordered that the Morrones take nothing in their suit against Prestonwood and Pryor. The court also entered a take-nothing judgment against Prestonwood and Pryor on their counterclaim. There is no appeal

of the judgment granted to Caldwell. The Morrones, Prestonwood, and Pryor appeal the remainder of the trial court's judgment. We affirm.

The Morrones brought causes of action based upon negligence (including negligence per se and gross negligence), intentional infliction of emotional distress, and negligent misrepresentation. The Morrones predicated Prestonwood's liability for Pryor's acts upon the doctrine of respondeat superior. The Morrones also alleged that Prestonwood failed to supervise Pryor, that Prestonwood failed to investigate other complaints about Pryor, and that Prestonwood was negligent in retaining her as a teacher.

The Morrones sought to recover for post-traumatic stress syndrome, serious mental injury, severe psychological pain and suffering in the past and future, and severe mental anguish in the past and future. They also alleged that Emma suffered from certain physical conditions as a result of her mental anguish. Additionally, they sought damages to recover the cost of psychological testing and counseling services as well as for financial losses in the amount of the contract with Prestonwood. The Morrones also sought exemplary damages.

Prestonwood and Pryor filed a motion for summary judgment on the claims against them; they advanced both traditional and no-evidence grounds. Because our holding on the traditional motion for summary judgment is dispositive of this appeal, we will not address the no-evidence motion for summary judgment.

■■■ We will apply the well-recognized standard of review for traditional summary judgments. A trial court must grant a traditional motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and the party is entitled to judgment

as a matter of law. Tex.R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). A defendant moving for summary judgment on an affirmative defense must prove each element of its defense as a matter of law, leaving no issues of material fact. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 927 (Tex.1996). Once the movant establishes a right to summary judgment, the nonmovant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979). We take as true evidence favorable to the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). When a trial court's order does not specify the grounds relied upon for its ruling, the summary judgment will be affirmed on appeal if any of the summary judgment grounds advanced by the movant are meritorious. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

The summary judgment evidence shows that Prestonwood Christian Academy, a ministry of Prestonwood Christian Church in Plano, is a nonprofit private school. Emma was a kindergartner in Pryor's class at Prestonwood in 2002 and part of 2003. Pryor held a master's degree in early childhood and family services. Caldwell, who held a Bachelor's degree in interior design and a minor in marketing, was Pryor's aide from October 2, 2002, until sometime in March 2003.

Victoria Morrone testified in her deposition that, from October 2002, Emma showed signs of being unhappy. She would on occasion tell Victoria that she had had a bad day. She later, probably in December, began to have nightmares.

She also began to wet the bed as well as her pants, to exhibit anxiety and coping difficulties, and to suffer from other emotional problems. These problems were discussed in detail in a report made by Dr. Alexandria H. Doyle, a clinical psychologist who had examined and treated Emma. Because of our holding, although the report was made a part of the summary judgment evidence, we will not reach a discussion of Dr. Doyle's findings. The Morrones removed Emma from Prestonwood in March 2003 after Caldwell related the essence of the following information to them.

Caldwell's deposition was made a part of the summary judgment evidence. Not long after she began to work as Pryor's aide, Caldwell began to notice what she thought was disturbing and inappropriate behavior directed at the students by Pryor.

Caldwell described instances of the disturbing and inappropriate behavior. One student in Pryor's class had a loud voice. When the student would speak in a loud voice, Pryor would tell her to go sit down, and the girl would cry. This girl cried more than the rest of the children. Another student had trouble staying on task and staying focused. Pryor grabbed his math paper from him and made him sit in front of the math chart. The boy cried. Similar conduct was exhibited toward another student. He cried and shook uncontrollably for ten to fifteen minutes. In her deposition, Caldwell maintained that, while this sort of disturbing and inappropriate behavior would not occur daily, it did occur on a weekly basis. Pryor would make the students feel badly about answering questions. She would say things to them such as, "Well, that's not correct. You didn't answer that correctly. You should know that. You should know the answer to that question." Caldwell felt that Pryor's behavior was disrespectful and condescending. It was "just the overall feel of the classroom."

There were other instances related by Caldwell. Pryor yelled at a student for not getting his work done. Pryor's voice toned down when another teacher came in. Caldwell also related what she called small inconsistencies. If a child wanted to sharpen a pencil, sometimes Pryor would let them and other times she would not. On the occasions when she would not let them sharpen the pencil, she would "raise her voice and tell them, in a very abrupt manner, to go sit down." She would tell them that they were to sharpen their pencils at the start of the day. On another occasion, there was a student who liked to tell stories. When he tried to tell Pryor a story, she made him stop and told him to go sit down and "it made him sad." Someone told Caldwell that in a prior year her child had been in Pryor's class and that the child said that Pryor was mean.

In March, Pryor implemented a "heart tool." Pryor asked Caldwell to make a large heart and put it on the bulletin board. The purpose of the heart tool was to promote loving attitudes. Pryor asked Caldwell to put a verse about love on the heart. Caldwell chose "love one another." She also made smaller hearts with each child's name on it. These smaller individual hearts were pinned to the larger heart. If a child was seen not loving another child, that child had to remove his or her heart from the bigger heart. Caldwell testified that one child had to remove her individual heart from the board. The student "was crushed." Later in the day, during prayer time, another child read her prayer list, and as a part of her prayer list, she said to pray for the student because "she has a selfish heart." If a child had to remove his or her heart from the larger heart, it would be replaced the next day.

The child who had to remove her heart from the larger heart was normally a very secure person but, on this occasion, "was crushed."

Regarding Emma, the first three months she struggled with phonics and with math. She improved as the year went on. The first thing that Caldwell noticed about Emma when Caldwell started working as an aide at Prestonwood was that Emma had a "very sad puppy dog look on her face." She also observed that Emma was struggling. Emma would get up out of her chair and go to Pryor for help. Instead of helping Emma, Pryor, "in a very abrupt and loud tone of voice[,] would tell Emma to go sit back down, that she did not need help"; Emma would cry. This sort of thing would happen about once a week between October 2002 and mid-January 2003. Caldwell referred many times to what she perceived to be Pryor's abrupt tone of voice as well as her disturbing, inappropriate, and abusive behavior toward Emma and other students in Emma's presence. Caldwell testified that there was nothing else in Pryor's behavior that caused Emma to cry any more than the other students. She did not consider Pryor's behavior to be child abuse. Neither did she believe that Pryor intentionally caused emotional harm to the children.

Caldwell also testified that Pryor exhibited inappropriate behavior toward her. Pryor corrected Caldwell in the presence of the children. On another occasion, Caldwell gave a Christmas present to Pryor in front of the class; and Pryor did not acknowledge her but, instead, just "blew [her] off" and humiliated her. Another person told Caldwell that she had noticed this incident.

Caldwell's affidavit also contains allegations that there was a lack of control, a lack of discipline, and a lack of consistency in Pryor's class. Pryor's class was difficult to control at times. She attributed it to Pryor's lack of consistency. Caldwell also had trouble controlling the class when she substituted for Pryor. She could not control them because she did not feel that it was right to yell and scream at them. On one such occasion, the children were misbehaving, were being disrespectful, and were so out of control that it made Caldwell cry. Another teacher came in and assisted Caldwell in controlling the class.

Carole Rouse was a teacher at Prestonwood. A portion of her deposition was made a part of the summary judgment record. Rouse testified about the habit of trying to match teachers to her students who were moving up based in part on personalities and in part on need. Using this system, with input from other teachers, there were certain students who would not be placed with a particular teacher because of the belief that it would not be a good fit.

Robin Browning, a parent who sometimes assisted in the classroom, told Caldwell that she had concerns over discipline not only in Pryor's class but also in the school. Browning also witnessed Pryor raising her voice to the children and had been told by another parent that Pryor had "yanked" their child's arm and yelled and screamed at him. Browning told Caldwell that she thought that Pryor "was working on burnout."

Caldwell attributed Pryor's alleged disturbing and inappropriate behavior to several things. First, she testified that some of Pryor's problems might be attributed to the fact that Pryor was having issues with a daughter who was suffering from depression. Next, Caldwell attributed Pryor's treatment of the students as well as others to what she called a "heart problem," meaning that she "had difficulty being nurturing, loving, warm, friendly, kind, considerate, [and] compassionate."

In her deposition, Caldwell said that Pryor had the ability to make learning fun. Pryor was creative and gave the students an opportunity to have hands-on experience when they would do science activities. She could also sing, and the children liked to sing with her. Pryor would sing songs that helped the students with math concepts. "When it was group time, she had the ability to make learning fun for the kids." "[S]he had a fun way of describing things to the children."

Caldwell did not report any of the alleged disturbing and inappropriate behavior until March 15, 2003, when she told the Morrones. No one else told them about the alleged behavior. Caldwell was their only source. Victoria Morrone was a "room mom." She was in and out of the classroom often and also participated on field trips. She had helped Pryor in the classroom. She would listen to the children read on a weekly basis for an hour to an hour and a half and would "come in often to bring Emma lunch" and sit with her while she ate.

The principal of the Prestonwood Lower School during 2002 and 2003 was Donna Gilson. The summary judgment proof contained an affidavit by Gilson. In the affidavit, Gilson said that she had never received any complaints about Pryor before Caldwell complained in March 2003. Gilson also examined the records in her custody, including Pryor's personnel file, and found no complaints against Pryor before the Caldwell complaint. The summary judgment evidence also contained an affidavit by Paige DeLeon, principal of Prestonwood Lower School from the beginning of the school year in 1997 until May 2002. She supervised Pryor, and she never received any complaints about Pryor "acting in an abusive, disturbing, inappropriate, or unprofessional manner" toward any student or class at Prestonwood.

Pryor claims that she is entitled to immunity as provided for in the Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. §§ 6731–6738. Section 6736 provides in relevant part:

(a) Liability protection for teachers

Except as provided in subsection (b), no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if—

(1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;

(2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;

(3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

(4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher.

■ The Morrones argue that Pryor's claim of immunity fails for several reasons. The Morrones claim that the Act applies only to teachers who are properly certified by the State. Pryor was not certified as a teacher by the State of Texas. However, the Act applies also to those who are "authorized by the appropriate authorities."

Section 6736(a)(3). The summary judgment proof establishes that Pryor has a master's degree in early childhood and family studies. The summary judgment proof also shows that she is authorized to teach in private schools in Texas under Prestonwood's accreditation through the Southern Association of Colleges and Schools. We hold that Pryor was an authorized person under the terms of the Coverdell Act.

■ The Morrones also claim that the Act applies only in states that receive funds "under this chapter." Section 6734. They reason that, since Texas does not receive funds under the Coverdell Act, Pryor is not entitled to the protection of the immunity provisions of that Act. Title 20 U.S.C. is the Title that is dedicated to education. Chapter 70 of that Title provides for many things, including the distribution of funds to the States. Subchapter II of Chapter 70 contains a Subpart 5 that is entitled "Teacher Liability Protection," otherwise known as the "Paul D. Coverdell Teacher Protection Act of 2001." Because Texas receives funds "under this chapter" (Chapter 70), Pryor is entitled to the immunity provided by the Act unless she is excluded from its protections for reasons stated in the Act, which we will now discuss.

The final argument that the Morrones make regarding the inapplicability of the immunity provisions of the Coverdell Act is that the Act does not apply to claims of intentional or criminal misconduct or gross neglect. The Act provides that there is no immunity for willful misconduct or "criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher." Although the Morrones argue this point generally, we think it necessary to examine individually the various exceptions.

We will first discuss willful misconduct and gross negligence. The Act defines neither "willful misconduct" nor "gross negligence." However, Texas cases are instructive on the general definitions of the concepts.

■ The court in *Wheeler* noted that "willful" is like the phrase "heedless and reckless disregard" and means "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Wheeler v. Yettie Kersting Mem. Hosp.*, 866 S.W.2d 32, 50 n. 25 (Tex.App.-Houston [1st Dist.] 1993, no writ) (citing *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 916–20 (Tex.1981)). The court in *Burk* said that the term is synonymous with "gross negligence." *Burk Royalty*, 616 S.W.2d at 920. If, on the other hand, "willful" means "intentional," as argued by the Morrones, then Pryor's conduct, to remove her from the protection of the Coverdell Act, would amount to an intentional tort. The fundamental difference between negligent injury or even grossly negligent injury and intentional injury is the specific intent to inflict injury. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex.1985). In the Restatement (Second) of Torts, intent is defined to mean that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965).

■ The commonly accepted legal meaning of "gross negligence" is "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." *State v. Shumake*, 199 S.W.3d 279, 287 (Tex.2006).

■ According to the Restatement (Second) of Torts, reckless conduct occurs when a person:

[D]oes an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

RESTATEMENT (SECOND) OF TORTS § 500 (1965).

■ Reckless conduct is also described as conduct that is "wanton or wilful." *Id.* § 500 Special Note. Reckless conduct is different from negligence that is "mere inadvertence, incompetence, [or] unskillfulness." *Id.* § 500 cmt. g. "Reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Id.*

Next, we will examine whether the summary judgment evidence shows that Pryor was guilty of criminal misconduct so as to lose the protection otherwise afforded by the Coverdell Act. The Morrones argue that Pryor violated TEX. PEN.CODE ANN. § 22.04 (Vernon Supp 2006). Section 22.04 provides as follows:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:

(1) serious bodily injury;

(2) serious mental deficiency, impairment, or injury; or

(3) bodily injury.

TEX. PEN.CODE ANN. § 6.03 (Vernon 2003) defines each of the culpable mental states as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d) A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Before Pryor could be found to have committed an offense under Section 22.04, her acts must have been such that she intentionally, knowingly, recklessly, or with criminal negligence by an act or intentionally, knowingly, or recklessly by an omission caused serious bodily injury, serious mental deficiency, impairment, or injury, or bodily injury to Emma. The only summary judgment evidence in this regard comes from Caldwell, and she testified that she did not believe that Pryor intended to cause emotional harm to the children.

Perhaps the methods shown by the summary judgment evidence to have been used by Pryor might have been less than ideal, but that is not the question before us. Our task is to determine whether she has conclusively proven as a matter of law that she is entitled to the affirmative defense of immunity under the Coverdell Act. We hold that she has. The trial court did not err when it granted summary judgment for Pryor.[2] And, we further hold that qualified immunity also protects Prestonwood from the derivative claims filed against it and that the trial court did not err when it granted Prestonwood's motion for summary judgment.

The Morrones also claimed that Prestonwood negligently supervised Pryor, failed to investigate prior complaints, failed to discover and prevent emotional abuse by Pryor, and failed to protect Emma. Although several statements of fact are made regarding the content of the summary judgment record, no record references on this point are made in the brief. We will nevertheless discuss the issue.

One of the elements of a negligence cause of action is proximate cause, and proximate cause consists of cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942, 951–52 (Tex.App.-Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex.1995). In *Doe*, a volunteer for the Boys Club sexually abused various individuals. The volunteer had been convicted twice for misdemeanor driving while intoxicated. In a suit against the club, the victims claimed that the club was negligent in not conducting a proper investigation. The Amarillo court held that, even if a duty were breached by the club, the injury was not foreseeable. 868 S.W.2d at 952. The court found that knowledge of the two DWI convictions would not have put the club on notice that the volunteer might be a pedophile. *Id.* On appeal to the Texas Supreme Court, that court focused on the cause-in-fact requirement of proximate cause:

> We conclude that if the Boys Club breached a duty to investigate, screen, or supervise volunteers, this breach was not the cause in fact of the plaintiffs'

---

2. We note that it has long been the policy of the State of Texas to give school teachers the necessary support to enable them to efficiently discharge their responsibilities. *Hogenson v. Williams*, 542 S.W.2d 456 (Tex.Civ.App.-Texarkana 1976, no writ). This policy is apparent in the provisions of Tex. Educ.Code Ann. § 22.0511 (Vernon 2006). Section 22.0511(a) and its predecessor, Tex Educ.Code § 22.051(a) (1995), both provide:

> A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judg-

ment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

Effective September 1, 2003, the immunity provided under Section 22.0511(a) was extended to include that afforded under the Paul D. Coverdell Act and applied the immunity to those who provide services to private schools as well. Section 22.0511(c).

The policy is also evidenced in the application of immunity to charter schools and employees. *See* Tex. Educ.Code Ann. § 12.1056 (Vernon 2006).

injuries. Assuming the Boys Club had investigated [the volunteer's] criminal record, revelation of the two misdemeanor DWI convictions would not have precluded [his] presence at the club. The club knew that [he] was a probationer under court order to perform community service; further investigation would only have provided details about the nature of his offenses. There is no evidence that the Boys Club would not have taken [him] as a volunteer if it had known he had been convicted for driving while intoxicated. We conclude that [his] presence at the club was not due to breach of any duty to screen or to investigate.

*Doe,* 907 S.W.2d at 477–78.

■ The basis of liability in a negligent hiring case is the employer's own negligence (not the negligence of the employee) in either hiring or retaining one whom the employer either knows or should have known was unfit or was not competent for the job and that such acts or omissions resulted in an unreasonable risk of harm to others. *Wise v. Complete Staffing Servs., Inc.,* 56 S.W.3d 900, 904–05 (Tex.App.-Texarkana 2001, no pet.). If Prestonwood in some way breached a duty to the Morrones by failing to check on Pryor either before or during her period of employment, the summary judgment evidence shows that as a matter of law any such breach did not proximately cause the damages alleged by the Morrones. Nothing would have been found that would have caused Prestonwood not to hire or to fire Pryor. Any breach would not have been the proximate cause of the injuries alleged by the Morrones because there was no act or omission that was the cause in fact of the alleged injuries and because the injuries were not foreseeable. *Doe,* 907 S.W.2d at 477–78; *Doe,* 868 S.W.2d at 951–52. The trial court did not err in granting summary judgment on this issue.

■ Regarding their cross-appeal, Prestonwood and Pryor complain in one issue that they did not receive twenty-one days notice of the hearing on the Morrones' motion for summary judgment. *See* Tex.R. Civ P. 166a(c). Prestonwood and Pryor have not shown by this record that either objected to the lack of notice in the trial court. Neither does the record show a request for continuance or a motion for new trial. Prestonwood and Pryor have waived the issue, and their sole issue on the cross-appeal is overruled. *Delta (Del.) Petroleum & Energy Corp. v. Houston Fishing Tools Co.,* 670 S.W.2d 295, 296 (Tex.App.-Houston [1st Dist.] 1983, no writ).

The judgment of the trial court is affirmed.