**Reversed and Remanded, and Majority and Concurring and Dissenting Opinions filed June 30, 2015.**



In the

# Fourteenth Court of Appeals

## NO. 14-13-00352-CV

### BP OIL PIPELINE COMPANY, Appellant

### V.

### PLAINS PIPELINE, L.P., Appellee

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2011-39550**

## M A J O R I T Y   O P I N I O N

This case arises out of a dispute between the buyer and the seller of a pipeline system over the scope of a contractual indemnity in the purchase agreement. The main issue is whether a claim asserted in a separate lawsuit falls within the indemnity, thus requiring the buyer to indemnify the seller for the claim.

The trial court granted the buyer's summary-judgment motion and denied the seller's summary-judgment motion. We conclude the trial court was wrong to grant the buyer's summary-judgment motion and right to deny the seller's summary-judgment motion. We reverse and remand.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

In 1957, the Gulf and Mississippi River Transportation Company, Ltd. ("G&M") acquired a twenty-percent undivided fee interest in a 5.19 acre tract on Grand Terre Island in Louisiana (the "Tract"). In 1960, G&M and the other owners of the Tract granted a right-of-way servitude to Gulf Refining Company ("Gulf") for the purpose of constructing, maintaining, and operating a pumping station to be used for a pipeline. Gulf built and operated a pumping station on the Tract ("Pumping Station"). After the twenty-year servitude expired in 1980, Gulf filed an expropriation suit against the owners, but the suit lapsed for lack of prosecution. In 1986, Gulf's corporate successor, Chevron Pipeline Company, sold its pipeline system, including the Pumping Station, to Sohio Pipeline Company, the corporate predecessor of appellant/plaintiff BP Oil Pipeline Company ("BP"). In 1988, Chevron acquired an undivided 1.5% fee interest in the Tract and transferred it to Sohio, BP's corporate predecessor. In 2006, BP and appellee/defendant Plains Pipeline, L.P. executed a purchase agreement (the "Agreement"), whereby BP[1] sold the pipeline system, including the Pumping Station, to Plains.

---

[1] The "Seller Group" under the Agreement also included BP Pipelines (North America) Inc. and Vastar Pipeline, LLC.

### The Louisiana Claim

In 2009, G&M and Plains entered into an agreement whereby G&M granted Plains a servitude for the Pumping Station. At the same time, G&M settled with Plains regarding Plains's alleged wrongful use of the Pumping Station from 2006 through 2009. In 2010, G&M sued BP and Chevron in Louisiana federal court, asserting an accounting claim, among others, against BP. In its accounting claim against BP (the "Louisiana Claim"), G&M alleged that if BP is a co-owner of a small undivided interest in the Tract, BP's "utilization of the [Pumping Station] for [its] sole economic benefit . . . obligates [BP] to account to [G&M] for the revenues and profits which [BP has] gained through the operation of the [Pumping Station]." On appeal from the district court's summary judgment in favor of BP, the United States Court of Appeals for the Fifth Circuit reversed the judgment as to the Louisiana Claim and remanded for the district court to resolve whether "the revenues and profits that BP derived from operating the Pumping Station could be characterized as the civil fruits of the Pumping Station, the co-owned [t]ract, or both." *Gulf & Miss. River Transp. Co., Ltd. v. BP Oil Pipeline Co.*, 730 F.3d 484, 493–94 (5th Cir. 2013).

### Suit for Indemnification and Counterclaim for Declaratory Judgment

Invoking Plains's indemnity obligations under the Agreement, BP demanded that Plains provide indemnification with regard to the Louisiana Claim. Plains rejected the demand. BP then sued Plains for breach of Plains's indemnity obligations under the Agreement and for a declaratory judgment that Plains is obligated under the Agreement to indemnify BP as to the Louisiana Claim. Plains asserted various affirmative defenses and a counterclaim for a declaratory judgment that Plains does not owe BP any indemnity. BP filed special exceptions,

arguing that Plains may not seek such a declaratory judgment because declaratory relief is not available to settle a dispute already before a court.

### *Cross-Motions for Summary Judgment*

Plains moved for a traditional summary judgment with regard to BP's claims, arguing that it was entitled to judgment as a matter of law because (1) BP could not seek indemnity for an obligation specifically allocated to BP under the Agreement and (2) the Agreement did not apply to losses arising from BP's gross negligence or willful misconduct. BP filed a cross-motion for partial summary judgment on its claims and responded in opposition to Plains's motion for summary judgment. BP argued that the Agreement's broad indemnity clause, not any provision for "rent payments and similar expenses," applied to the Louisiana Claim.

The trial court granted BP's cross-motion for partial summary judgment and denied Plains's summary-judgment motion. Plains then filed a motion for reconsideration of the granting of BP's summary-judgment motion. The trial court granted Plains's motion for reconsideration, vacated its prior order, and denied BP's motion for partial summary judgment. Plains then filed a motion requesting the trial court to reconsider its order denying Plains's summary-judgment motion in light of the granting of its motion to reconsider. Plains also filed an amended traditional summary-judgment motion, arguing it was entitled to judgment as a matter of law as to BP's claims and to declaratory judgment in Plains's favor. BP responded and filed an amended cross-motion for traditional summary judgment seeking declaratory judgment in its favor[2] and requesting the trial court either to

---

[2] Unlike its initial cross-motion, BP's amended cross-motion for summary judgment did not address its breach-of-contract claim.

grant BP's special exceptions as to Plains's declaratory-judgment claim or to grant a summary judgment against Plains on its declaratory-judgment claim.

### *The Trial Court's Rulings*

The trial court granted Plains's amended motion for summary judgment, dismissing all of BP's claims with prejudice. In addition, the trial court declared that Plains has no duty to indemnify or hold BP harmless and is not responsible for damages assessed with respect to the Louisiana Claim. The trial court denied BP's amended cross-motion for summary judgment and also denied BP's special exceptions. The trial court held an evidentiary hearing on attorney's fees. The trial court signed a final judgment, rendering judgment for Plains, ordering that BP take nothing on its claims and that Plains recover from BP $431,210.50 in attorney's fees, plus interest on fees, court costs, and conditional fees on appeal.

### *Issues on Appeal*

BP brings four issues on appeal: (1) the trial court erred when it granted Plains's amended motion for summary judgment; (2) the trial court erred when it denied BP's amended cross-motion for summary judgment; (3) the trial court erred when it denied BP's special exceptions; and (4) the trial court erred when it granted final judgment and awarded Plains its attorney's fees.

### II. STANDARD OF REVIEW

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo review of a trial court's

5

summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). In its amended cross-motion, BP did not seek a final judgment; nonetheless, this court may review the trial court's denial of this cross-motion because BP and Plains each sought summary judgment on the same issues. *See Frontier Logistics, L.P. v. National Property Holdings, L.P.*, 417 S.W.3d 656, 664 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

### III. INTERPRETATION OF THE AGREEMENT

In construing the Agreement, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the written instrument. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). We cannot consider any single provision, in isolation, as controlling; rather we must consider all provisions in the context of the entire agreement. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

6

Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id*. But, when a written contract is worded such that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

We cannot rewrite the contract or add to its language under the guise of interpretation. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162; *Frontier Logistics, L.P.* 417 S.W.3d at 660. We also bear in mind Texas's fundamental public policy in favor of a broad freedom of contract, which allows parties to allocate risks as they see fit. *See El Paso Field Services, L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012); *Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 95 (Tex.2011); *Fairfield Ins. Co. v. Stephens Martin Paving, L.P.,* 246 S.W.3d 653, 664 (Tex.2008). Contract enforcement is an "indispensable partner" to the freedom of contract. *See El Paso Field Services, L.P.*, 389 S.W.3d at 812.

Both BP and Plains agree that a critical issue is the interpretation of the Agreement and that the Agreement's provisions are unambiguous. Yet, the parties seek opposing interpretations. BP's position is that the Louisiana Claim falls under the plain language of the Agreement's indemnity obligations as enumerated in section 10.1, while Plains's position is that the Louisiana Claim remains the sole obligation of BP as a pre-closing expense under the plain language of subsection 6.3(d)(ii) of the Agreement ("Expense Provision"). We first examine whether the summary-judgment evidence proves as a matter of law that the Louisiana Claim is a pre-closing expense under the Expense Provision that is the sole obligation of

7

BP. We then address whether the summary-judgment evidence proves as a matter of law that BP is entitled to indemnity under section 10.1(b) of the Agreement.

### *Is the Louisiana Claim the sole obligation of BP under the Agreement's Expense Provision?*

The Expense Provision states:

> Unless otherwise provided by the Parties in writing, all utility, accounts payable for goods and services, rent payments and similar expenses attributable to the Pipeline Assets for any period of time on or prior to the Closing Date, regardless of when due or payable, shall be the sole obligation of the Seller Group and the Seller Group shall promptly pay, or if paid by [Plains], promptly reimburse [Plains] for and hold [Plains] harmless from and against same. Subject to the terms of this Purchase Agreement, unless otherwise provided by the Parties in writing, all utility, accounts payable for goods and services, rent payments and similar expenses attributable to the Pipeline Assets for any periods of time subsequent to the Closing Date, regardless of when due or payable, shall be the sole obligation of [Plains] and [Plains] shall promptly pay, or if paid by the Seller Group, promptly reimburse the Seller Group for and hold the Seller Group harmless from and against same.

Plains asserts that this court cannot read the Agreement's indemnity provision so broadly as to rob the Expense Provision of its effect and render it meaningless. Plains contends the general indemnity obligations under section 10.1 "cannot be read to trump BP's retention of liability for pre-closing 'utility, accounts payable[,] rent payments and similar expenses attributable to the Pipeline Assets' in the Expense Provision." Plains argues the relief sought in the Louisiana Claim constitutes a "rent payment or similar expense" from which BP agreed to hold Plains harmless. We first consider whether the relief sought constitutes a "rent payment" and then whether it constitutes a "similar expense."

*"Rent Payments"*

BP argues the meaning of "rent" involves an explicit, contractual arrangement between landlord and tenant, and it is uncontested that no such agreement existed between G&M and BP. Plains, by contrast, insists that the meaning of "rent" is not so restricted and contemplates a broader meaning of income, return, or profits arising out of land.

Terms in an agreement are given their plain, ordinary and generally accepted meanings unless the agreement itself shows the terms to be used in a technical or different sense. *Heritage Res., Inc.*, 939 S.W.2d at 121–22. The Agreement does not define "rent payments," nor does the Agreement show that the term is used in a technical or different sense in the Expense Provision, so we apply the plain, ordinary, and generally accepted meaning of the term. *See id*.

"Rent" is "[c]onsideration paid, usu[ally] periodically, for the use or occupancy of property (esp. real property)." *Black's Law Dictionary* 1322 (8th ed. 2004). *See also id.* 909 (defining "lease" as "[t]o grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration"). "Rent" also is defined as "a usually fixed periodical return made by a tenant or occupant of property to the owner for the possession and use thereof; especially: an agreed sum paid at fixed intervals by a tenant to the landlord." *Merriam-Webster's Collegiate Dictionary* 1054 (11th ed. 2004). "Payment" is defined as "something that is paid: something given to discharge a debt or obligation or to fulfill a promise." *Webster's Third New Int'l Dictionary* 1659 (1993 ed.). We conclude the plain, ordinary, and generally accepted meaning of "rent payments" is something paid to a landlord or owner in exchange for the right to use, occupy, or possess real or personal property. *See Turner v. First Nat'l*

9

*Bank*, 234 S.W. 928, 928 (Tex. Civ. App.—Texarkana 1921, no writ) (concluding that the word "rent" means compensation which an owner of property receives for its use by another); *cf. Franklin v. Jackson*, 847 S.W.2d 306, 308 (Tex. App.—El Paso 1992, writ denied) (interpreting "lease" to mean "a contract by which one owning such property grants to another the right to possess, use and enjoy it for a specified period of time in exchange for periodic payment of a stipulated price, referred to as rent").[3]

In the Louisiana Claim, G&M does not seek to recover payments owed by BP in exchange for the right to use, occupy, or possess real or personal property; rather, G&M seeks an accounting from BP, a co-owner with G&M of the Tract, for a share of the revenues and profits which BP has derived from its use of the Pumping Station.[4]  Simply stated, because BP owned the Pumping Station and co-owned the Tract, BP would not owe G&M "rent" because BP already had the right to use and occupy the Tract, and thus would not need to pay for that right.  *See Gulf & Miss. River Transp. Co., Ltd.*, 730 F.3d at 487, 492; *Williams v. Mai*, No. 01-11-00611-CV, 2012 WL 6644704, at *6 (Tex. App.—Houston [1st Dist.] Dec.

---

[3] Plains cites *Bearden v. Knight*, 228 S.W.2d 837, 843–44 (Tex. 1950), for the proposition that "rents" means more than compensation received by the landowner for the use of land by another and also can include income, return, or profits.  But, the *Bearden* court was interpreting a statute rather than a contract, and that statute has long since been repealed. *See id*. Moreover, the *Bearden* court based its holding primarily on a necessary implication from other statutes that used the broader term "rents and revenues." *See id*. at 844.

[4] The Fifth Circuit Court of Appeals stated that G&M might be able to recover a share of the revenues and profits that BP earned from its use of the Pumping Station if these revenues and profits were "civil fruits" of the Tract under article 551 of the Louisiana Civil Code. *See Gulf & Miss. River Transp. Co., Ltd.*, 730 F.3d at 492–94. Plains notes that, under this statute, "[c]ivil fruits are revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions."  La Civ. Code Ann. art. 551 (West, Westlaw through 2014 R.S.); *Gulf & Miss. River Transp. Co., Ltd.*, 730 F.3d at 492. Though the definition of "civil fruits" includes "rentals," this does not mandate the conclusion that BP's revenues and profits from operating the Pumping Station are "rentals" or "rent payments."

20, 2012, no pet.) ("Any co-tenant who owns an interest in property has the right to possession of the property.") (mem. op.); *Fuqua v. Fuqua*, 750 S.W.2d 238, 246 (Tex. App.—Dallas 1988, writ denied) (noting that unless there exists an understanding to the contrary, "a tenant in common may occupy all or more than his proportionate share of the jointly owned property without liability to his co-tenants for the rental value of his use"); *Burns v. Wood*, 427 S.W.2d 353, 357 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e.) (same).[5] We conclude the term "rent payments" is unambiguous. Under the applicable standard of review, the summary-judgment evidence proves as a matter of law that the relief sought in the Louisiana Claim does not fall within the meaning of "rent payments" as used in the Expense Provision.[6] *See Gulf & Miss. River Transp. Co., Ltd.*, 730 F.3d at 487, 492; *Williams*, 2012 WL 6644704, at *6; *Fuqua*, 750 S.W.2d at 246; *Burns*, 427 S.W.2d at 357; *Turner*, 234 S.W. at 928; *Black's Law Dictionary* 909, 1322; *Merriam-Webster's Collegiate Dictionary* 1054.

*"Similar Expenses"*

Plains further contends that because the Expense Provision does not limit its reach to "rent payments" alone, and specifically states that pre-closing "similar expenses" are also the sole obligation of the Seller Group, "expenses" that are not "rent payments," but are "similar" to rent payments and the other enumerated

---

[5] Louisiana law appears to be consistent on this point. *See Juneau v. Laborde*, 82 So.2d 693, 696 (La. 1955) ("This right of co-owners to possession of the property being equal and coextensive, neither becomes indebted to the other for his personal occupancy and enjoyment . . . .").

[6] We cannot agree with Plains that the meaning of "rent payments" somehow reaches to money paid by third parties that shipped their product through the Pumping Station. While such payments may constitute "expenses" of those third parties, they are not expenses of the pipeline business owner. Rather, these payments would be monies paid to and received by the pipeline business owner.

items, are likewise encompassed by the Expense Provision. The term "expenses" is not defined in the Agreement, so we are to give this term its plain, ordinary, and generally accepted meaning unless the Agreement itself shows the term to be used in a technical or different sense. *See Heritage Res., Inc.*, 939 S.W.2d at 121–22. Because the Agreement does not show that "expenses" is used in a technical or different sense in the Expense Provision, we give the term its plain, ordinary, and generally accepted meaning. *See id.*

An "expense" is "[a]n expenditure of money, time, labor, or resources to accomplish a result; esp. a business expenditure chargeable against revenue for a specific period." *Black's Law Dictionary* 617 (8th 2004); *see Endeavor Natural Gas, L.P. v. Magnum Hunter Prod., Inc.*, No. 13-06-352-CV, 2007 WL 4340870, at *6 (Tex. App.—Corpus Christi Dec. 13, 2007, no pet.) (mem. op.) (citing *Black's* definition). An "expense" also is defined as "something expended to secure a benefit or bring about a result"; "financial burden or outlay: cost"; or "an item of business outlay chargeable against revenue for a specific period." *Merriam-Webster's Collegiate Dictionary* 440 (11th ed. 2004). We conclude the plain, ordinary, and generally accepted meaning of "expense" is an expenditure of money, time, labor, or resources that goes toward accomplishing a result or achieving a benefit. *See Endeavor Natural Gas, L.P.*, 2007 WL 4340870, at *6.

Each of the enumerated items within the Expense Provision fits within this meaning of "expense." "Utilities" are "service[s] (as light, power, or water) provided by a public utility." *Merriam-Webster's Collegiate Dictionary* 1378 (11th ed. 2004). That is, "utilities" comprise an "expense."[7] To operate a pipeline

---

[7] *See Black's Law Dictionary* 618 (8th 2004) (including "utilities" within definition of "general administrative expense").

business, a company expends money to secure the benefit of such utility services. Next, an "account payable" is "an account reflecting a balance owed to a creditor; a debt owed by an enterprise in the normal course of business dealing," *Black's Law Dictionary* 18 (8th 2004), or "the balance due to a creditor on a current account." *Merriam-Webster's Collegiate Dictionary* 8 (11th ed. 2004). Moreover, the "accounts payable" term within the Expense Provision is further qualified by the phrase "for goods and services." "Accounts payable for goods and services" also constitutes an "expense"; to operate a pipeline business, a company secures the benefit of goods and services by incurring debt, and the creditors providing such items then collect on the balances. Likewise, as discussed above, a "rent payment" reflects an "expense"[8]; a pipeline business may spend money to secure the benefit of occupying or using property that someone else owns.

In the Louisiana Claim, G&M seeks an accounting from BP for a share of the revenues and profits which BP has derived from its use of the Pumping Station. Unlike utilities, accounts payable for goods and services, and rent payments, the relief sought in the Louisiana Claim does not fall within the meaning of "expense" as used in the Expense Provision. An accounting allegedly owed to a co-owner of the land upon which the Pumping Station sits for some proportion of revenues and profits attributable to the operation of the Pumping Station is not an expenditure put forth by BP or the Seller Group for the purpose of securing any type of benefit. Any apportionment out of any of BP's revenues and profits to its co-owner does not constitute expenditures by BP or the Seller Group to achieve a benefit or result, but rather is a division or sharing of monies received or gained by BP. *See*

---

[8] *See Black's Law Dictionary* 618 (8th 2004) (including "rent" within definitions of "general administrative expense" and "prepaid expense").

13

*Endeavor Natural Gas*, 2007 WL 4340870, at *6 (considering the common meaning of "expenses" and concluding that "[c]learly, the severance tax refunds and credits would not constitute an expense for either [defendant] or [plaintiff] as they were monies received rather than expended"). *See also Black's Law Dictionary* 1344 (8th 2004) (defining "revenue" as "[g]ross income or receipts"); Merriam-*Webster's Collegiate Dictionary* 1066 (11th ed. 2004) (defining "revenue" as "the total income produced by a given source" or "the gross income returned by an investment"); *Black's Law Dictionary* 1246 (8th 2004) (defining "profit" as "[t]he excess of revenues over expenditures in a business transaction"); *Merriam-Webster's Collegiate Dictionary* 992 (11th ed. 2004) (defining "profit" as "a valuable return: gain" or "net income usually for a given period of time"). We conclude the term "expenses" is unambiguous and, under the applicable standard of review, the summary-judgment evidence proves as a matter of law that the relief sought in the Louisiana Claim does not fall within the meaning of "expenses" as used in the Expense Provision.[9] *See Endeavor Natural Gas, L.P.*, 2007 WL 4340870, at *6; *Black's Law Dictionary* 617 (8th 2004); *Merriam-Webster's Collegiate Dictionary* 440 (11th ed. 2004).

Significantly, the final item specified in the Expense Provision is not "expenses" but "similar expenses." Even if the relief sought in the Louisiana Claim were to fall within the meaning of "expenses" as used in the Expense Provision, the term "similar expenses" is clear and, as a matter of law, this relief is not an "expense" similar to utilities, accounts payable for goods and services, and

---

[9] Plains asserts that, to the extent both section 10.1(b) and the Expense Provision may be construed to address the relief sought in the Louisiana Claim, the specific Expense Provision should control over the general provision in section 10.1(b). Because we conclude that, as a matter of law, this relief does not fall within the scope of the Expense Provision, we need not address this argument.

rent payments attributable to the Pipeline Assets.[10]  *See Endeavor Natural Gas, L.P.*, 2007 WL 4340870, at *6; *Black's Law Dictionary* 18, 617, 618, 1344 (8th 2004); *Merriam-Webster's Collegiate Dictionary* 8, 440, 992, 1066 (11th ed. 2004).

BP and Plains both brief the *ejusdem generis* canon of construction.[11] Under this canon, if general words follow an enumeration of specific persons or things, the general words apply only to persons or things of the same kind or class as those specifically mentioned.[12]  *See City of Houston v. Bates*, 406 S.W.3d 539, 545 (Tex. 2013); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665–66 (Tex. 1987).  *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*)").  The parties urge us to apply *ejusdem generis* in the interpretation of the Expense Provision.

---

[10] Plains relies on *Sonerra Resources Corp. v. Helmerich & Payne International Drilling Co.*, No. 01-11-00459-CV, 2012 WL 3776428 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem. op.).  In *Sonerra*, the parties entered into a drilling contract containing various indemnity provisions.  Considering the contract as a whole and seeking to harmonize all the provisions, our sister court concluded that one provision regarding inspection of materials granted a more specific indemnity "carve-out" for claims related to furnished materials than the more general reciprocal indemnity provisions covering a "broad class of persons and a broad class of losses."  *Id.* at *7.  Because the dispute at issue indeed fell within the scope of the "carve-out" clause, indemnity was precluded; thus, the *Sonerra* court affirmed the judgment in which the trial court found no breach of indemnity as a matter of law.  *Id.* at *7, *9.  However, *Sonerra* is distinguishable from today's case, in which the relief sought in the Louisiana Claim does not fall within the scope of the Expense Provision.

[11] The Latin phrase *ejusdem generis* means "of the same kind or class." *Black's Law Dictionary* 556 (8th 2004).

[12] According to BP, while *ejusdem generis* would recognize "unlisted, analogous contractual obligations" as "similar expenses," it would not include unliquidated claims for revenues and profits.  According to Plains, however, the meaning of "similar" is not so limited, and this court cannot insert terms such as "liquidated," "contractual," or "vendors" into section 6.3(d)(ii).

15

But, in light of the contractual language the parties chose, we find it unnecessary to do so. The general phrase "and other expenses," following a specific enumeration of things, would apply only to expenses similar to the particular items named. *See Bates*, 406 S.W.3d at 545; *Barnett*, 723 S.W.2d at 665–66. There is no need to apply the *ejusdem generis* canon to the construction of the Expense Provision because the parties expressly agreed that the final item is "similar expenses."[13] *See Barnett*, 723 S.W.2d at 665–66 (concluding that there is no need to apply the *ejusdem generis* canon of construction if the parties expressly agree that the final item is limited to things similar to those previously enumerated). Thus, the parties built *ejusdem generis* into the Agreement by expressly limiting "expenses" to only expenses that are similar to those listed in the text of the Expense Provision. The relief sought in the Louisiana Claim (if it were an expense) is not like the other things in the list.[14]

We conclude the Expense Provision of the Agreement is unambiguous.[15] Under the applicable standard of review, the summary-judgment evidence proves, as a matter of law, that the relief sought in the Louisiana Claim is not a pre-closing expense that is the sole obligation of the Seller Group under the Expense

---

[13] In any event, our interpretation of the Expense Provision is consistent with the *ejusdem generis* canon.

[14] Plains asserts that a conclusion that the relief sought in the Louisiana Claim does not fall within the scope of the Expense Provision would make that provision meaningless. But, such a conclusion does not deprive the Expense Provision of its meaning. That provision still applies to matters that fall within the scope of the provision's unambiguous language.

[15] BP argues in the alternative that if this court determines that section 6.3(d)(ii) is susceptible to more than one reasonable interpretation, then the Agreement is ambiguous and a fact question exists precluding summary judgment. We do not reach this alternative argument because we conclude the provisions of the Agreement at issue are unambiguous.

Provision.[16] *See Gulf & Miss. River Transp. Co., Ltd.*, 730 F.3d at 487, 492; *Williams*, 2012 WL 6644704, at \*6; *Endeavor Natural Gas, L.P.*, 2007 WL 4340870, at \*6; *Fuqua*, 750 S.W.2d at 246; *Burns*, 427 S.W.2d at 357; *Turner*, 234 S.W. at 928; *Black's Law Dictionary* 18, 617, 618, 909, 1322, 1344 (8th 2004); *Merriam-Webster's Collegiate Dictionary* 8, 440, 992, 1054, 1066 (11th ed. 2004).

### *Does the Louisiana Claim fall within the scope of Plains's indemnity under section 10.1(b) of the Agreement?*

We first examine the language of the Agreement regarding Plains's indemnity under section 10.1(b) of the Agreement, and then we address whether the summary-judgment evidence proves as a matter of law that the Louisiana Claim falls within the scope of this indemnity.

### *Relevant Language of the Agreement*

The Agreement contains an indemnity provision that outlines the general indemnification obligations of the parties:

10.1 <u>General Indemnification</u>.

    (a) Subject to the provisions of this ARTICLE X . . . , from and after the Closing,[17] [BP18] agrees to indemnify and hold harmless [Plains]. . . from and against any and all of [Plains's] Losses[19]. . . claims, actions, suits and other proceedings . . . which [Plains]

---

[16] We need not address whether Plains's written agreement to indemnify BP under section 10.1(b) of the Agreement falls within the phrase "[u]nless otherwise provided by the Parties in writing" and thus takes that indemnity obligation outside the scope of the Expense Provision.

[17] "Closing" is defined in section 9.1 of the Agreement as "[t]he consummation of the transactions contemplated by this Purchase Agreement."

[18] BP Pipelines (North America) Inc. and Vastar Pipeline, LLC, the other members of the "Seller Group" under the Agreement, are also indemnitors in section 10.1(a) of the Agreement.

[19] As defined in the Agreement, "Losses" means "damages, fines, penalties, judgments, losses, liabilities, costs and reasonable expenses (including without limitation, reasonable attorneys' fees and expenses)."

demonstrates resulted from, relate to or arise out of the following: . . .

. . .

(iv) [BP's] gross negligence or willful misconduct (whether sole, passive, active or concurrent) in the construction, operation, maintenance, repair, expansion or management of the Purchased Pipeline Systems; or

(v) [BP's] gross negligence or willful misconduct (whether sole, passive, active or concurrent) in the ownership or use of the Purchased Pipeline Systems other than with respect to the construction, operation, maintenance, repair, expansion or management of the Purchased Pipeline Systems . . .

except, in each case, to the extent that [BP] demonstrates such Losses resulted from, relate to or arise out of the gross negligence or willful misconduct of [Plains or Plains's Affiliated Companies] or its or their officers, directors, agents and employees.

(b) Subject to the provisions of this ARTICLE X, from and after the Closing, [Plains] agrees to indemnify and hold harmless [BP]. . . from and against any and all Losses . . . , claims, actions, suits and other proceedings . . . which result from, relate to or arise out of the following:

. . .

(iii) [BP'S] NEGLIGENCE (WHETHER SOLE, PASSIVE, ACTIVE OR CONCURRENT) OR OTHER LEGAL FAULT (INCLUDING BUT NOT LIMITED TO STRICT LIABILITY) IN THE CONSTRUCTION, OPERATION, MAINTENANCE, REPAIR, EXPANSION OR MANAGEMENT OF THE PURCHASED PIPELINE SYSTEMS;

(iv) [BP'S] NEGLIGENCE (WHETHER SOLE, PASSIVE, ACTIVE OR CONCURRENT) OR OTHER LEGAL FAULT (INCLUDING BUT NOT LIMITED TO STRICT LIABILITY) IN THE OWNERSHIP OR USE OF THE PURCHASED PIPELINE SYSTEMS OTHER THAN WITH RESPECT TO THE CONSTRUCTION, OPERATION, MAINTENANCE, REPAIR, EXPANSION OR MANAGEMENT OF THE PURCHASED PIPELINE SYSTEMS (WHICH MATTERS SHALL BE

GOVERNED BY SECTION 10.1(b)(iii) ABOVE); or

(v) any Assumed Liability not governed by Section 10.1(b)(iii) or Section 10.1(b)(iv) above;

except, in each case, to the extent that [Plains] demonstrates such Losses resulted from, relate to or arise out of the gross negligence or willful misconduct of the Seller Group[20] or its officers, directors, agents and employees.

BP contends that section 10.1 requires Plains to indemnify BP for claims resulting from BP's negligence or other legal fault in connection with the construction, operation, maintenance, repair, expansion, management, use, or ownership of the pipeline, while BP must indemnify Plains only for claims that Plains demonstrates resulted from BP's gross negligence or willful misconduct in connection with the same.

In addition, according to BP, under subsection 10.1(b)(v), Plains broadly must indemnify BP for all "Assumed Liabilities" not otherwise governed by section 10.1(b)(iii) or section 10.1(b)(iv). The Agreement defines "Assumed Liabilities" to mean "all Pipeline Liabilities other than (i) the Excluded Liabilities[21] (which are retained by the Seller Group) and (ii) any obligations or liabilities of the Seller Group arising under section 10.1(a) . . . of this Purchase Agreement."  BP further notes that under section 2.1 of the Agreement, entitled

---

[20] As defined in the Agreement, the "Seller Group" collectively refers to BP, BP Pipelines (North America) Inc., and Vastar Pipeline, LLC.

[21] As defined in the Agreement, "Excluded Liabilities" means "those Pipeline Liabilities listed on the Excluded Liabilities Schedule attached hereto and all liabilities related to the Excluded Assets."  In the Agreement, "Excluded Assets" is defined as "those assets listed on the Excluded Assets Schedule attached hereto; *provided* that, for the avoidance of doubt and as set forth on the Excluded Assets Schedule, the Excluded Assets shall not include any asset listed specifically, and not merely described generically, on the Pipelines Schedule, the Pipeline Equipment Schedule or the Assigned Contracts Schedule."

19

"Purchase and Sale of the Pipeline Assets," Plains expressly agreed to "assume the 'Assumed Liabilities.'"

BP emphasizes the broad scope of the term "Pipeline Liabilities," defined in the Agreement to mean:

> all liabilities, obligations, responsibilities, costs and expenses of whatever kind and nature, primary or secondary, direct or indirect, absolute or contingent, whether based in common law or statute or arising under written contract or otherwise (including strict liability), known or unknown, liquidated or unliquidated, real or potential, tangible or intangible, whether or not accrued, caused by, arising out of, incurred in connection with or relating in any way to the ownership or use of the Pipeline Assets or the construction, operation, maintenance, repair, expansion or management of the Purchased Pipeline Systems now existing or arising at any time prior to, on or after the Closing Date,[22] as heretofore, currently or hereafter conducted.

According to BP, because the Louisiana Claim is not an "Excluded Liability"[23] and does not present circumstances demonstrating BP's gross negligence or willful misconduct, Plains expressly agreed to assume it. BP argues the broad definition of "Pipeline Liabilities" and, in turn, "Assumed Liabilities" covers the Louisiana Claim.

To ascertain the parties' true intentions, we examine the entire Agreement in an effort to harmonize and give effect to all of its provisions. *See J.M. Davidson*, 128 S.W.3d at 229; *MCI Telecomms.*, 995 S.W.2d at 652. We note that, in

---

[22] As defined in the Agreement, "Closing Date" means "11:59 p.m. CPT on the last Business Day of the month in which the closing conditions set forth in ARTICLE VII and ARTICLE VIII have been satisfied or waived . . . ."

[23] The Excluded Liabilities Schedule does not include the Louisiana Claim. Nor does the Louisiana Claim relate to any "Excluded Asset."

addition to the definitions upon which BP relies, the Agreement contains other defined terms referenced within the indemnity provision. The definition of "Pipeline Assets" includes "the Purchased Pipeline Systems." As defined in the Agreement, "Purchased Pipeline Systems" means "the Pipeline Systems, the Pipeline Equipment and Pipeline Real Property, excluding the Excluded Assets." The term "Pipeline Systems" is defined as the following items, collectively:

> (i) a crude petroleum pipeline running from Bay Marchand and Empire, Louisiana, to the Alliance Refinery in Belle Chasse, Louisiana ("BOA Pipeline"), and (ii) . . . an interest in crude petroleum pipelines running from the High Island area of the Western Gulf of Mexico to Texas City, Texas ("HIPS Pipeline"), all as shown on the map in the Pipelines Schedule attached hereto (which pipelines in (i) and (ii) include, for the avoidance of doubt, each pipeline expressly identified in the Pipelines Schedule whether or not currently in service).

The term "Pipeline Equipment" is defined as "certain pipeline equipment expressly listed on the [attached] Pipeline Equipment Schedule." The term "Pipeline Real Property" is defined as the following items, collectively:

> one or more parcels of land which the Seller Group owns in fee simple (collectively, the *"Fee Property"*) and parcels of land which the Seller Group has the right to use and occupy under certain leases, easements, rights-of-way, permits, licenses and other rights to, or interests in, real property, relating to the installation, construction, ownership, maintenance, repair and operation of the Pipeline Systems and the Pipeline Equipment (said leases, easements, rights-of-way, permits, licenses and other rights and interests being collectively referred to as the *"Non-Fee Property"* . . . a listing of such Fee Property and Non Fee Property being set forth on the [attached] Fee Property Schedule and Non-Fee Property Schedule . . . ).

We cannot ignore pertinent portions of schedules to the Agreement. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 313 (Tex. 2005) (per curiam).

21

The Pipeline Equipment Schedule expressly includes and describes the "Grand Terre Pump Station." Additionally, the Fee Property Schedule expressly lists and provides recording information for the 1.5% fee interest transferred by Chevron to Sohio (BP's corporate predecessor) in 1988.

*Application of the Agreement's Language, other than the Final Clause, to the Louisiana Claim*

We conclude the language of the Agreement regarding the parties' indemnity obligations is unambiguous. *See Frontier Logistics, L.P.*, 417 S.W.3d at 661–63 (concluding that indemnity language in an agreement was unambiguous). Section 10.1(b) is a single, long sentence, the final clause of which (hereinafter the "Final Clause") contains an exclusion of certain matters from the scope of Plains's indemnity under section 10.1(b).[24] Interpreting this clear text, we conclude Plains is not obligated to indemnify BP under section 10.1(b) to the extent that Plains demonstrates that the losses for which indemnity is sought resulted from, relate to, or arise out of, the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents and employees.[25]

Unless the Final Clause applies, under the contract's clear language, Plains agrees to indemnify and hold harmless BP from and against any and all Losses, claims, actions, suits, and other proceedings, which result from, relate to or arise out of BP's negligence or other legal fault, including strict liability in the construction, operation, maintenance, repair, expansion or management of the

---

[24] This clause reads as follows: "except, in each case, to the extent that [Plains] demonstrates such Losses resulted from, relate to or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents and employees."

[25] Environmental Losses, claims, actions, suits, and other proceedings also are excluded from the scope of the indemnity under Section 10.1(b), but that exclusion is not relevant in today's case.

Purchased Pipeline Systems or in the ownership or use of the Purchased Pipeline Systems, which includes the Pumping Station and the Tract that are the subject of the Louisiana Claim. Without addressing whether the Final Clause applies, we conclude as an initial matter that the summary-judgment evidence proves, as a matter of law, that the Louisiana Claim otherwise falls within the scope of the foregoing indemnity.[26]

*Application of the Final Clause to the Louisiana Claim*

In Plains's amended motion for traditional summary judgment, Plains asserted that it did not owe any indemnity under section 10.1(b) because the facts and circumstances on which the Louisiana Claim is based resulted from, relate to, or arise out of BP's gross negligence or willful misconduct. In BP's amended cross-motion for traditional summary judgment, BP asserted that, as a matter of law, Plains must indemnify BP as to the Louisiana Claim, and the Final Clause does not apply because BP did not engage in gross negligence or willful misconduct.[27] Under the unambiguous language of the Final Clause, Plains does not owe BP indemnity under section 10.1(b) if Plains demonstrates that the losses for which BP seeks indemnity resulted from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors,

---

[26] Without addressing whether the Final Clause applies, we conclude that even if the Louisiana Claim did not fall within the scope of the foregoing indemnity, the summary-judgment evidence would prove, as a matter of law, that the Louisiana Claim otherwise falls within the scope of Plains's indemnity from and against any and all Losses, claims, actions, suits, and other proceedings, which result from, relate to or arise out of any Assumed Liability not governed by section 10.1(b)(iii) or section 10.1(b)(iv) of the Agreement.

[27] Our dissenting colleague concludes that this motion was a no-evidence summary-judgment motion. We address this issue in more detail in the next section of this opinion.

agents, and employees (collectively "Gross Negligence").[28]  Thus, in Plains's motion for traditional summary judgment, Plains had the burden of proving as a matter of law that the losses for which BP seeks indemnity resulted from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents, and employees. *See Willrich*, 28 S.W.3d at 23.  In BP's motion for traditional summary judgment, BP had the burden of proving as a matter of law that the losses for which BP seeks indemnity did not result from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents, and employees.  *See Willrich*, 28 S.W.3d at 23.

In *Reeder v. Wood County Energy, LLC*, under a joint operating agreement, the operator had no liability for losses sustained or liabilities incurred by the other parties except for those resulting from the operator's "gross negligence or willful misconduct." *See Reeder v. Wood County Energy, LLC*, 395 S.W.3d 789, 793–95 (Tex. 2012), *supplemental opinion on reh'g and new judgment issued on other grounds*, 395 S.W.3d 797, 797–98 (Tex. 2013) (per curiam).  The jury found that the operator's conduct amounted to "gross negligence or willful misconduct."  *See*

---

[28] Under the unambiguous language of section 10.1(a), the Seller Group indemnifies Plains against losses that resulted from, relate to, or arise out of the Seller Group's gross negligence or willful misconduct in the construction, operation, maintenance, repair, expansion, management, ownership, or use of the Purchased Pipeline Systems, except to the extent that the Seller Group demonstrates that such losses resulted from, relate to, or arise out of Plains's gross negligence or willful misconduct.  Under the unambiguous language of the Final Clause of section 10.1(b), Plains has the burden of proving at trial that the losses for which BP seeks indemnity resulted from, relate to, or arise out of the Seller Group's Gross Negligence.  If the Final Clause simply said "except, in each case, to the extent that such Losses resulted from, relate to or arise out of [the Seller Group's Gross Negligence]," then BP would have had the burden of proving at trial that any losses did not result from, relate to, or arise out of BP's Gross Negligence.  *See Genesis Tax Loan Servs. v. Kothmann*, 339 S.W.3d 104, 107–08 (Tex. 2011).

*id*. at 795–96. The Supreme Court of Texas held that there was no evidence that the operator acted with gross negligence or willful misconduct, based solely on the court's conclusion that there was no evidence to support a finding of gross negligence, without any additional inquiry, necessarily equating "willful misconduct" with "gross negligence." *See id*. at 795–97.

Thus, under binding precedent, in Plains's motion for traditional summary judgment, Plains had the burden of proving as a matter of law that the losses for which BP seeks indemnity resulted from, relate to, or arise out of the gross negligence of the Seller Group or its officers, directors, agents, and employees, and in BP's motion for traditional summary judgment, BP had the burden of proving as a matter of law that the losses for which BP seeks indemnity did not result from, relate to, or arise out of the gross negligence of the Seller Group or its officers, directors, agents, and employees.[29] *See Reeder*, 395 S.W.3d at 795–97; *Willrich*, 28 S.W.3d at 23; *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 916–20 (Tex. 1981) (equating willful negligence with gross negligence); *Faith v. CSFB 19990C1 Rockhaven Place Ltd. P'ship*, 303 S.W.3d 1, 6–7 (Tex. App.—Dallas 2009, pet. denied) (equating willful misconduct with gross negligence); *Chrismon v. Brown*, 246 S.W.3d 102, 106–07 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding that, under binding precedent, willful negligence is the same as gross negligence); *Morrone v. Prestonwood Christian Academy,* 215 S.W.3d 575, 582 (Tex. App.—Eastland 2007, pet. denied) (equating willful misconduct with gross negligence); *Wheeler v. Yettie Kersting Mem. Hosp.,* 866 S.W.2d 32, 50 & n. 25 (Tex. App.—Houston [1st Dist.] 1993, no writ) (equating willful negligence with

---

[29] We recognize that under this construction, two contractual terms have the same meaning, yet binding precedent commands this result.

gross negligence).

Gross negligence means an act or omission: (1) which, when viewed objectively from the standpoint of the actor at the time of occurrence, involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West, Westlaw through 2013 3d C.S.); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994). An extreme degree of risk is not "a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). In examining proof of the subjective component of gross negligence, courts focus on the actor's state of mind, examining whether the actor knew about the peril caused by the actor's conduct but acted in a way that demonstrates the actor did not care about the consequences to others. *Reeder*, 395 S.W.3d at 796. "An act or omission that is merely ineffective, thoughtless, careless, or not inordinately risky is not grossly negligent." *Id.* at 797. Only if the actor's conduct is unjustifiable and likely to cause serious harm can it be grossly negligent. *Id.*

In its live pleading, Plains alleges that the conduct of BP that gave rise to the Louisiana Claim constituted gross negligence or willful misconduct. In its amended summary-judgment motion, Plains asserted that G&S alleged willful misconduct in its complaint in Louisiana federal court. But, in the complaints attached to Plains's summary-judgment motion, G&S does not allege that BP engaged in conduct constituting either gross negligence or willful misconduct.[30] In

---

[30] Plains attached to its amended motion pleadings G&M filed in Louisiana federal district court;

these complaints, G&S alleges BP used and operated the Pumping Station without any legal right to do so and without any authorization or permission from G&S and that this use and operation was wrongful and constituted a trespass. Other documents attached to Plains's summary-judgment motion reflect that, in the Louisiana litigation, BP denied that its use of the Pumping Station was without any authorization and that G&S asserted that BP possessed the Pumping Station in bad faith. The summary-judgment evidence[31] does not show that G&S has ever alleged or asserted that BP engaged in conduct that constituted either gross negligence or willful misconduct.[32]

In its amended summary-judgment motion, Plains asserted the following:

- BP knew about the 1980 servitude's expiration.
- BP did not disclose the expiration of the servitude to Plains.
- BP never paid G&M.
- BP did not acquire an ownership interest in the Tract until 1988 and did not have rights to use and operate the Pumping Station on the Tract until late 1988.
- Plains asked for relevant information regarding rights to the Tract during the due diligence process.
- BP failed to provide the information requested or disclose issues regarding the Pumping Station.

---

BP's memorandum in opposition to G&M's partial motion for summary judgment in the Louisiana lawsuit; an affidavit from Plains's vice president and general counsel, which included the Agreement as an exhibit and a redacted excerpt from a "Buyer Q&A session" with BP; and the federal district court's April 7, 2011 summary-judgment ruling.

[31] BP attached to its amended cross-motion for summary judgment its special exceptions to Plains's answer and counterclaims and the federal district court's July 11, 2012 summary-judgment ruling in the Louisiana lawsuit.

[32] Therefore, we need not and do not address the significance, if any, of any such allegation or assertion.

27

- BP disclosed issues regarding the Pumping Station to another potential buyer, but not to Plains.
- BP knew that it had never paid anything to the other landowners for the right to operate the Pumping Station.

Plains, however, did not support all of these statements with citations to the summary-judgment record. In any event, even if BP knew in 1986 that the servitude had expired and nonetheless operated the Pumping Station until it became a co-owner of the Tract in 1988, without paying G&M, the summary-judgment evidence does not address whether BP's acts or omissions, when viewed objectively from BP's standpoint at the time, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.[33] *See Moriel*, 879 S.W.2d at 23; *Chrismon*, 246 S.W.3d at 106–07. Nor does this evidence address whether BP was subjectively aware of an extreme degree of risk, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *See Moriel*, 879 S.W.2d at 23; *Chrismon*, 246 S.W.3d at 107.

---

[33] Our dissenting colleague asserts that the differences between the burden for a movant seeking a no-evidence summary judgment and the burden for a movant seeking a traditional summary judgment are not relevant to this court's analysis because BP and Plains submitted "extensive summary judgment evidence." *See post* at pp. 4–5. But, neither the quantity nor the quality of evidence attached to cross-motions seeking only a traditional summary judgment alters the burden shouldered by each movant seeking a summary judgment. *See Frontier Logistics, L.P.*, 417 S.W.3d at 659 (noting in case involving cross-motions for traditional summary judgment that "[w]hen both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its burden"). And, the cases cited by our colleague do not support this proposition. *See Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013) (stating that the different burdens for a traditional motion and a no-evidence motion were immaterial in case in which movant filed hybrid motion asserting both traditional and no-evidence grounds); *Cohen v. Landry's Inc.*, 442 S.W.3d 818, 824–26 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (analyzing case under both traditional and no-evidence standards as to essential element challenged in both a traditional and no-evidence ground).

Presuming without deciding that BP failed to disclose to Plains relevant information regarding the operation of the Pumping Station and rights to the Tract, any such failure to disclose would not show Gross Negligence by BP in its conduct that gave rise to the Louisiana Claim.

We conclude that under the applicable standard of review, the summary-judgment evidence does not address whether the losses for which BP seeks indemnity resulted from, relate to, or arise out of the Seller Group's Gross Negligence.[34] *See Buffington v. Sharp*, 440 S.W.3d 677, 683–84 (Tex. App.— Houston [14th Dist.] 2012, pet. denied). Plains did not satisfy its burden of proving as a matter of law that the losses for which BP seeks indemnity resulted from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents, and employees. *See id.* Nor did BP satisfy its burden of proving as a matter of law that these losses did not result from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents, and employees. *See id.* Thus, Plains did not show it was entitled to a traditional summary judgment as to BP's claims and BP did not show that it was entitled to a traditional summary judgment as to its declaratory-judgment claim regarding the indemnity. *See id.*

*BP's Motion for Summary Judgment*

Our dissenting colleague concludes that BP was entitled to summary

---

[34] Our dissenting colleague suggests that this court should render judgment granting summary judgment in BP's favor "in the interest of judicial economy." *Post* at p. 5. In the interest of judicial economy, an appellate court may consider summary-judgment grounds that the movant preserved for appellate review but that the trial court did not make a basis of its summary judgment. *See Neely*, 418 S.W.3d at 60. But, in reviewing whether the trial court should have granted summary judgment on the grounds in question, the reviewing court does not consider judicial economy as a factor in determining whether a party is entitled to summary judgment in its favor. *See id*. at 59–60.

judgment on its declaratory-judgment claim regarding indemnity based in part on the incorrect premise that BP asserted a no-evidence summary-judgment ground on this issue.

If a summary-judgment movant clearly sets forth in its motion a no-evidence ground and otherwise meets Rule 166a(i)'s requirements, then the movant has asserted a no-evidence ground. *See Merriman v. XTO Energy, Inc*., 407 S.W.3d 244, 248 (Tex. 2013); *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004); *Chrismon v. Brown*, 246 S.W.3d 102, 120 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (supp. op. on reh'g). To state a no-evidence ground the movant must assert clearly that there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i) (stating that a no-evidence movant seeks "summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial" and that "[t]he motion must state the elements as to which there is no evidence"); *Chrismon*, 246 S.W.3d at 114, n. 12, 120. A statement in a summary-judgment motion that there is no evidence of a matter that is not an essential element of a claim or defense does not indicate that the movant is asserting a no-evidence ground for summary judgment. *See Lawrence Marshall Dealerships v. Meltzer*, No. 14-07-00920-CV, 2009 WL 136908, at *2, n.1 (Tex. App.—Houston [14th Dist.] Jan. 20, 2009, no pet.) (mem. op.).

In its amended cross-motion, BP did not seek summary judgment as to its breach-of-contract claim; instead, the only relief BP requested as to its claims was that the trial court "grant BP's amended cross-motion for summary judgment on its declaratory-judgment action because the Agreement unambiguously requires

Plains to indemnify BP against [the Louisiana Claim]." To meet the rule's requirements, a no-evidence motion must contain a clear statement that there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i); *Kirkpatrick v. Cusick*, No. 13-13-00149-CV, 2013 WL 6730049, at *4 (Tex. App.—Corpus Christi Dec. 19, 2013, pet. denied) (mem. op.). BP's amended cross-motion was contained in a single instrument that was both an amended cross-motion for summary judgment and a response in opposition to Plains's amended motion for traditional summary judgment. BP did not distinguish between the portions of the instrument that are part of BP's amended cross-motion and the portions of the instrument that are part of BP's response to Plains's amended motion for traditional summary judgment. We presume for the sake of argument that proving the losses for which BP seeks indemnity resulted from, relate to, or arise out of BP's Gross Negligence is an essential element of a claim or defense on which Plains would have the burden of proof at trial, and thus would be the proper subject of a no-evidence ground. The only place in BP's amended cross-motion in which BP arguably asserts that there is no evidence of BP's Gross Negligence is at the end of the following paragraph:

> *BP will show, as a matter of law*, that the indemnity provision controls in this dispute, and that it requires Plains to indemnify BP for [the Louisiana claim.] While Plains asserts that the rent provision, which obligates BP to pay for pre-closing rent and similar expenses, governs this dispute, and thus seeks declaratory judgment that it is not required to assume responsibility for [the Louisiana Claim], Plains' position is insupportable. *The evidence demonstrates* the following:
>
> - The Agreement requires Plains to indemnify BP for obligations relating to the BOA Pipeline, regardless of when they occurred, unless said obligation was listed in a[n] Excluded Liabilities

Schedule or was the result of gross negligence or willful misconduct;

- It is impossible to accept Plains' alleged interpretation of the rent provision without mooting the plain language of the indemnity provision;

- G&M seeks an accounting for revenue and profits in the Louisiana Litigation and has never sought any relief amounting to "rent," nor is "rent" synonymous with "revenues and profits" in common usage under Texas law; and

- Plains has *no evidence* that BP engaged in any gross negligence or willful misconduct.[35]

Later in the motion, BP asserts as follows:

> The Court should not only deny Plains' Amended MSJ, *but also grant BP's cross-motion* for summary judgment on its request for declaratory judgment. *To prevail on its motion for summary judgment, a party must show* that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law. Tex. R. Civ. P. 166a. As discussed above, Plains unambiguously agreed to indemnify BP for the [Louisiana Claim] as a matter of law. *Accordingly*, the Court should grant BP's request for declaratory judgment that . . . .[36]

Though it is not clear what BP meant when it asserted that the summary-judgment evidence demonstrated that Plains has no evidence that BP engaged in Gross Negligence, BP may have meant that the summary-judgment evidence demonstrated that BP did not engage in Gross Negligence. Or, BP may have meant that, in support of Plains's motion for traditional summary judgment, Plains had failed to prove as a matter of law that BP had engaged in Gross Negligence. A

---

[35] The emphasis has been added. In the motion, the four bullet-point items were in bold.

[36] The emphasis has been added.

moving party is not required to cite the legal standard for a no-evidence motion to assert a no-evidence ground, yet it is relevant and revealing that BP recited the legal standard for a traditional motion but not the legal standard for a no-evidence motion. Context controls meaning. In context, the recitation of the traditional standard and the omission of the no-evidence standard suggests that BP was seeking the former and not the latter.

In the motion, BP sought summary judgment on its declaratory-judgment claim. BP did not assert that proof of its Gross Negligence or proof that the losses for which BP seeks indemnity resulted from, relate to, or arise out of BP's Gross Negligence was an essential element of a claim or defense on which Plains would have the burden of proof at trial. BP argued that it was entitled to summary judgment based on a showing it had made as a matter of law. BP did not clearly state that there was no evidence of an essential element of a claim or defense on which Plains would have the burden of proof at trial. We conclude that BP did not seek summary judgment on any no-evidence grounds; rather, BP, like Plains, sought a traditional summary judgment on the indemnity issue. *See* Tex. R. Civ. P. 166a; *Kirkpatrick*, 2013 WL 6730049, at *4; *Lawrence Marshall Dealerships*, 2009 WL 136908, at *2, n.1. Thus, even if Plains had the burden at trial to prove Gross Negligence, as a movant for a traditional summary judgment, BP had the burden of proving as a matter of law that the losses for which BP seeks indemnity did not result from, relate to, or arise out of the gross negligence or willful misconduct of the Seller Group or its officers, directors, agents, and employees. *See Willrich*, 28 S.W.3d at 23. Because BP did not make this showing, the burden did not shift to Plains to raise a genuine fact issue in response to BP's motion, and the trial court did not err in denying BP's summary-judgment motion. *See id*.;

33

*Buffington,* 440 S.W.3d at 683–84.

Our dissenting colleague concludes that BP asserted a no-evidence ground—that there was no evidence that BP engaged in Gross Negligence—based in part on the following language from BP's summary-judgment response and amended cross-motion:

> **2.** **BP's Conduct vis-à-vis G&M Did Not Constitute Gross Negligence**
>
> Plains argues that the claims asserted by G&M in the Louisiana Litigation demonstrate that BP engaged in "willful misconduct" in trespassing and/or failing to pay G&M its profits. *See* Plains' Amended MSJ at 19. Under the *IP Petroleum Co.* standard, Plains must demonstrate a "specific intent" on the part of BP to cause "substantial injury." Of course, no such evidence exists. Plains repeatedly asserts that BP's alleged failures were "intentional" and "deliberate" without any evidence whatsoever of BP's intent. *See id.*

In this part of the instrument, BP cites Plains's motion for traditional summary judgment twice and argues that, although Plains seeks a summary judgment based on its assertion that BP engaged in willful misconduct, Plains has not proved its entitlement to a traditional summary judgment because there is no summary-judgment evidence regarding BP's intent. The substance of this language is BP's response to Plains's summary-judgment motion rather than the assertion of a no-evidence ground. BP did not state that a no-evidence summary judgment should be granted based on the absence of any evidence that BP engaged in willful misconduct. Even if BP had stated such a ground, it would not be a proper no-evidence ground because BP's willful misconduct is not an essential element of a claim or defense on which Plains would have the burden of proof at

trial.[37]  *See* Tex. R. Civ. P. 166a; *Lawrence Marshall Dealerships*, 2009 WL 136908, at \*2, n.1.  At most, the essential element would be that the losses for which BP seeks indemnity resulted from, relate to, or arise out of BP's Gross Negligence, which includes both BP's gross negligence and willful misconduct.  In the language upon which our dissenting colleague relies, BP did not clearly state that there was no evidence of an essential element of a claim or defense on which Plains would have the burden of proof at trial.

### *The Proper Ruling on each Traditional Summary-Judgment Motion*

For the reasons outlined above, Plains did not show it was entitled to summary judgment as to BP's claims, and BP did not show that it was entitled to summary judgment as to its declaratory-judgment claim regarding the indemnity. *See Buffington,* 440 S.W.3d at 683–84.  Therefore, the trial court erred in granting Plains's motion for traditional summary judgment, but the trial court did not err in denying BP's motion for traditional summary judgment.[38]  Accordingly, we sustain BP's first and fourth issues and overrule BP's second issue.

## IV.  SPECIAL EXCEPTIONS

In its third issue, BP asserts the trial court erred in denying BP's special exceptions to Plains's Third Amended and Restated Answer, Defenses and

---

[37] Our dissenting colleague also concludes that BP's reference to an alleged "specific intent" on the part of BP to cause "substantial injury" is a reference to the legal standard for gross negligence. *See post* at p. 2.  Instead, it is a reference to the legal standard for "malice." *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (stating that "'[m]alice' means a specific intent by the defendant to cause substantial injury or harm to the claimant") (West, Westlaw through 2013 3d C.S.); *Owens v. Mason*, No. 14-12-00207-CV, 2013 WL 2382836, at \*7 (Tex. App.— Houston [14th Dist.] May 30, 2013, no pet.) (mem. op.).

[38] Plains argues that the trial court properly denied BP's summary-judgment motion because of various defenses asserted by Plains.  We need not address this argument.

Counterclaims ("Special Exceptions"). In its counterclaim, Plains sought a declaratory judgment that it has no duty to indemnify BP with respect to the Louisiana Claim and that Plains is not responsible for any damages assessed against BP in the Louisiana litigation or for BP's attorney's fees and costs in that litigation. Plains also sought reasonable and necessary attorney's fees under the Texas Declaratory Judgments Act. Plains filed this counterclaim in response to BP's claims against Plains for breach of contract and for a declaratory judgment that Plains is obligated under the Agreement to indemnify BP as to the Louisiana Claim.

Specially excepting to Plains's live pleading, BP asserted that Plains may not seek a declaratory judgment that it is not liable for breach of its indemnity obligations under the Agreement because declaratory relief is not available to settle a dispute already before a court. BP relied on the Supreme Court of Texas's opinion in *BHP Petroleum Co. v. Millard* and related cases from our sister courts of appeals. *See* 800 S.W.2d 838, 841 (Tex. 1990). In *BHP Petroleum*, the plaintiff asserted breach-of-contract and tort claims, but did not assert any declaratory-judgment claim. *See id*. at 839 & n.3. The *BHP Petroleum* court held that the defendant in that case stated a claim for affirmative relief under the Texas Declaratory Judgments Act that survived the plaintiff's nonsuit. *See id*. at 840–42. The high court did not hold that a defendant may not counterclaim for a declaratory judgment that it is not liable for breach of a contract in response to the plaintiff's request for a declaratory judgment that the defendant breached the contract. *See id*.

Today's case does not involve a nonsuit by the plaintiff, and this court has held that, if a plaintiff asserts a claim for declaratory relief, a defendant may

36

counterclaim for declaratory relief in its favor on the same subject, even though the counterclaim addresses issues already before the court. *See Elder v. Bro*, 809 S.W.2d 799, 800–801 (Tex. App.—Houston [14th Dist.] 1991, writ denied). *See also Washington Square Financial, LLC v. RSL Funding*, *LLC*, 418 S.W.3d 761, 775–76 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (noting continued validity of *Elder* precedent but concluding that it did not apply in that case because the plaintiff did not assert any declaratory-judgment claim). Because BP sought declaratory relief regarding Plains's indemnity obligations under the Agreement, Plains properly could counterclaim for declaratory relief and seek attorney's fees under section 37.009 of the Texas Civil Practice and Remedies Code.[39] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West, Westlaw through 2013 3d C.S.); *Wells Fargo Bank v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015) (concluding defendant could properly request and obtain attorney's fees under section 37.009 of the Texas Civil Practice and Remedies Code in response to plaintiff's claim for declaratory relief); *U.S. Fidelity & Guar. Co. v. Coastal Refining and Marketing, Inc.*, 369 S.W.3d 559, 571–72 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (same as *Wells Fargo Bank*); *Elder*, 809 S.W.2d at 800–801. Because the trial court did not err in denying the Special Exceptions, we overrule BP's third issue.

---

[39] The facts of *MBM Financial Corporation v. Woodlands Operating Company* are materially different because in that case the plaintiff unsuccessfully sought to recover for breach of contract and sought to obtain declaratory relief and attorney's fees under section 37.009. *See* 292 S.W.3d 660, 663, 668–71 (Tex. 2009). The high court in *MBM Financial* concluded that the plaintiff could obtain declaratory relief but could not recover attorney's fees under section 37.009. *See id.* at 668–71. Neither the holding of *MBM Financial* nor any judicial dicta in the opinion support the proposition that Plains may not recover attorney's fees under section 37.009. *See id.* Even if they did, the high court's more recent decision in *Wells Fargo Bank* is to the contrary. *Wells Fargo Bank v. Murphy*, 2015 WL 500636, at *3.

## V.   CONCLUSION

Plains did not show it was entitled to summary judgment as to BP's claims, and BP did not show that it was entitled to summary judgment as to its declaratory-judgment claim regarding the indemnity.   Therefore, the trial court erred in granting Plains's motion for traditional summary judgment and granting declaratory relief in Plains's favor, but the trial court did not err in denying BP's motion for traditional summary judgment.  Nor did the trial court err in denying the Special Exceptions.  The trial court's final judgment ordering that BP take nothing and awarding Plains attorney's fees is based on the trial court's erroneous granting of summary judgment in Plains's favor.  Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.


/s/     Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost, and Justices Donovan and Brown (Brown, J., concurring and dissenting).