2024 IL App (1st) 220884
Nos. 1-22-0884 & 1-22-0892 (consolidated)
Opinion filed: February 29, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0884

| | | |
|---|---|---|
| MEG YUKKI FERNANDEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 L 10156 |
| | ) | |
| MOTOROLA SOLUTIONS, INC., | ) | Honorable |
| | ) | Irwin J. Solganick, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

No. 1-22-0892

| | | |
|---|---|---|
| JONATHAN JOHNSON, a Disabled Person by | ) | Appeal from the |
| His Co-Guardians, Norman Johnson and | ) | Circuit Court of |
| Janice Ella Johnson; NORMAN | ) | Cook County |
| JOHNSON; and JANICE ELLA JOHNSON, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 10 L 7695 |
| v. | ) | |
| | ) | |
| MOTOROLA SOLUTIONS, INC., | ) | Honorable |
| | ) | Irwin J. Solganick, |
| Defendant-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hoffman and Ocasio concurred in the judgment and the opinion.

**OPINION**

¶ 1    Plaintiffs Meg Yukki Fernandez (Fernandez) and Jonathan Johnson (Johnson) were born

with severe birth defects that allegedly were caused prior to their conception, when their fathers

were exposed to reproductively toxic chemicals and gas while employed at a semiconductor

manufacturing facility in Texas owned by defendant, Motorola Solutions, Inc. (Motorola). The chemical exposure allegedly genetically changed the fathers' sperm, resulting in their future offspring's birth defects. Plaintiffs brought separate actions in the circuit court of Cook County against Motorola for negligence and willful and wanton misconduct. Fernandez's complaint was brought individually; Johnson's complaint was brought by and through his parents. In both cases, the circuit court granted summary judgment for Motorola, finding that it did not owe plaintiffs a duty under Texas law. The court also denied plaintiffs leave to amend their respective complaints to allege punitive damages. In this consolidated appeal, we reverse the orders granting summary judgment to Motorola on both complaints for negligence and willful and wanton misconduct and denying them leave to amend. We remand for further proceedings.

¶ 2 Johnson's parents additionally sought recovery for parental loss of child consortium. The circuit court granted summary judgment for Motorola. We affirm because parental loss of child consortium is not recognized under the applicable Texas law.

¶ 3 First, we address Fernandez's appeal. Then we will consider Johnson's appeal.

¶ 4 I. Fernandez

¶ 5 By way of background, Motorola is headquartered in Illinois and has semiconductor manufacturing plants in Arizona as well as a facility in Austin, Texas. Semiconductors are the basic materials needed to make integrated circuits, which are wafers made of silicon on which thousands or millions of tiny transistors, capacitors, and diodes are fabricated (manufactured). An integrated circuit is the fundamental building block of all modern electronic devices.

¶ 6 The manufacturing process of an integrated circuit largely takes place in so-called "clean rooms," which are controlled environments designed to prevent airborne contaminants from contacting semiconductor components during the manufacturing process. In the manufacturing

process, a thin film layer that will form the wiring, transistors, and other components is deposited on the wafer. The thin film is coated with photoresist, a type of light-sensitive protective coating. During the photolithography process, the circuit design is projected and transferred onto the wafer with ultraviolet light. The wafer then goes through an etching process whereby any unnecessary materials are removed so that only the desired circuit patterns remain on its exterior. There are two types of etching: dry etching and wet etching. Dry etching uses plasmas or etchant gases to remove the unwanted wafer layers. Wet etching uses liquid chemicals to remove the unwanted wafer layers.

¶ 7 From December 1994 to 1998, Fernandez's father, Armando, worked at Motorola's Texas facility as a specialist in the etching process, during which he was exposed to various chemicals and gas that allegedly affected his sperm, resulting in Fernandez's later birth defects. Armando's wife became pregnant with Fernandez in March 1995, approximately four months after Armando began his employment with Motorola. Fernandez was born with a cleft lip and palate, three of her fingers on her left hand were fused together, two of the fingers on her right hand did not fully mature, and multiple toes on her right and left feet did not fully mature and are missing toenails. Fernandez has had at least 10 surgeries to treat her various birth defects.

¶ 8 Fernandez's lawsuit is one of several separate personal injury cases filed in the circuit court of Cook County against Motorola, relating to severe birth defects in children of former Motorola employees who were exposed to toxic chemicals in the workplace. Eventually all the plaintiffs filed a combined fourth amended complaint against Motorola, which pleaded counts for negligence, willful and wanton misconduct, strict liability, breach of an assumed duty, and parental loss of child consortium.

¶ 9      In February 2016, Motorola brought motions to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)) against two of the plaintiffs, Sarina Finzer and Jeremy Hardison. Finzer's birth defects allegedly were caused by her father's exposure to toxic chemicals in Motorola's semiconductor manufacturing facility in Arizona; Hardison's birth defects allegedly were caused by his father's exposure to toxic chemicals in Motorola's semiconductor manufacturing facility in Texas. The circuit court determined that Arizona and Texas law applied, respectively, to the substantive issues in Finzer's and Hardison's cases and that Illinois law governed the procedural issues.

¶ 10     The circuit court dismissed with prejudice all of Finzer's and Hardison's claims in the fourth amended complaint; the claims of the remaining plaintiffs remained intact. On appeal, we reversed the dismissal of Finzer's and Hardison's claims for negligence and willful and wanton misconduct under Arizona and Texas law and Finzer's parents' claim for parental loss of child consortium under Arizona law, finding that the respective plaintiffs had adequately pleaded a duty, a breach thereof, and proximate cause. *Ledeaux v. Motorola, Inc.*, 2018 IL App (1st) 161345, ¶¶ 53-54 (hereinafter *Ledeaux I*, to distinguish it from a more recent case with the same caption, *Ledeaux v. Motorola Solutions, Inc.*, 2024 IL App (1st) 220886). We affirmed dismissal of Hardison's parents' claim for parental loss of child consortium under Texas law because such a claim is not a valid cause of action in Texas. *Id.* ¶ 54.

¶ 11     On remand, the circuit court ordered that each individual plaintiff's claim in the fourth amended complaint, with the exception of Jonathan Johnson and Marcus Ledeaux, be administratively dismissed and refiled with new case numbers.

¶ 12    On September 13, 2019, Fernandez individually refiled her two-count complaint alleging that her birth defects were proximately caused by Motorola's negligence and willful and wanton misconduct in knowingly exposing Armando to reproductively toxic chemicals and gas.

¶ 13    Fernandez alleged that Motorola acted negligently by failing to take reasonable measures to protect Armando from exposure to the toxic chemicals and gas, including providing him with adequate personal protective equipment; failing to warn Armando about the dangers that the toxic chemicals and gas posed to his reproductive health, including the potential for birth defects and miscarriages; and failing to design, approve, and/or implement proper industrial hygiene policies and/or adequate exhaust, ventilation, and air circulation systems.

¶ 14    Fernandez further alleged that Motorola acted willfully and wantonly by concealing from Armando his level of exposure to the toxic chemicals and gas, misrepresenting that the exposure posed no adverse health consequences to his future offspring, and purposely obtaining inaccurate and misrepresentative data falsely showing that Armando's exposure to the toxic chemicals and gas was not unsafe to himself or to his future offspring.

¶ 15    The parties engaged in extensive discovery. We proceed to set forth the relevant evidence obtained during the discovery process.

¶ 16    Armando testified during his deposition about his job duties as a specialist in the etching process at Motorola's semiconductor manufacturing plant in Texas, in the months before Fernandez was conceived. Armando worked 12-hour shifts from Thursday through Saturday, coming in at midnight and leaving at noon. Armando loaded and unloaded tools involved in both dry etching and wet etching and performed quality checks on the wafers. He wiped down the tools with isopropyl alcohol and changed out chemicals in the hydrofluoric acid bath used during the wet etching process. He delivered wafers to other areas in the plant, including to the

photolithography bay, where the circuit design was transferred to the wafer, and to the diffusion bay, where the wafer's electrical conductivity was modified. He went to the photolithography bay 10 to 50 times per shift and to the diffusion bay 10 to 20 times per shift. There were distinct "chemical smells" throughout the manufacturing facility, including in the etching and photolithography bays.

¶ 17    The only safety advice given to him by Motorola was to keep the hydrofluoric acid away from his skin and to call the nurse if any of it touched him. When working in the semiconductor manufacturing plant, Armando wore a hood, surgical mask, smock, boots, and latex gloves.

¶ 18    James Stewart, plaintiff's environmental health engineering expert, provided a report on the various chemicals Armando would have been exposed to while working as a specialist in the etching process and while dropping off wafers in the diffusion and photolithography bays. Such chemicals include carbon tetrachloride, hydrofluoric acid, nitric acid, arsenic, N-Methyl-2-Pyrrolidone (NMP), Hexamethyl Disilazane (HMDS), and propylene glycol methyl ether acetate (PGMEA). Armando also was exposed to arsine gas.

¶ 19    Stewart discussed the history of notifications to Motorola regarding reproductive hazards posed by chemicals used in the manufacturing of semiconductors. In 1981, Motorola received notification from DuPont regarding the reproductive toxicity of certain glycol ethers. In response, Motorola noted the need to "reinforce" exhaust ventilation and protective clothing requirements. Also in 1981, material safety data sheets received from manufacturers of photoresist warned of birth defects caused by glycol ethers on male and female animals. In 1982, Kodak sent Motorola a warning that glycol ethers have teratogenic effects (*i.e.*, the ability to disturb the growth and development of an embryo or fetus). It recommended that Motorola reduce exposures and inform

employees of the warning. The Semiconductor Industry Association (SIA) issued an additional warning in 1982 advising the industry to "evaluate, assess, and control glycol ether exposures."

¶ 20    To protect its workers from chemical exposure, Motorola provided them with latex gloves and other protective equipment, monitored their chemical exposures to ensure they did not exceed threshold limit values (TLVs) established by the American Conference of Governmental Industrial Hygienists or the permissible exposure limits (PELs) established by the Occupational Safety and Health Administration (OSHA), developed maternity notification forms to inform their physicians about their chemical exposures, offered access to material safety data sheets informing them about the chemicals to which they were being exposed, cofounded the SIA and participated in a worker task force to further limit its workers' chemical exposures, and hired an occupational medicine physician.

¶ 21    In 1983, Mike May, a certified industrial hygienist working for Motorola, announced the "Glycol Ether Monitoring Project," the purpose of which was to assess exposures to glycol ethers. This announcement was made about one year and seven months after the warning letter from DuPont. In 1994, Motorola formally eliminated glycol ethers from its semiconductor manufacturing.

¶ 22    Stewart criticized Motorola for taking more than one year to eliminate glycol ethers from the manufacturing process. He further criticized Motorola for failing to adequately train Armando and provide him with the necessary personal protective equipment for the tasks he was required to perform. Stewart was especially critical of the latex gloves provided to Armando, which were not effective protection against the chemicals used in Motorola's semiconductor manufacturing plant. Stewart concluded that "[w]orkplace conditions present at the Motorola facility resulted in a hazardous and unsafe workplace."

¶ 23    Fernandez filed a report from Dr. Robert Harrison, an occupational health physician. Harrison cited a statement from IBM in 1982 that set forth the best practices in the semiconductor industry for ensuring its workers' reproductive health from chemical toxicants. Motorola departed from these standard industry practices by failing to carefully investigate each of its chemicals so as to understand their potential reproductive hazards, failing to replace them to the extent technologically feasible, and failing to provide adequate safeguards such as ventilation controls and proper personal protective equipment and to fully advise workers of the nature of all potential reproductive risks.

¶ 24    Harrison was critical of Motorola's claims that its employees' chemical exposures were not greater than the PELs and TLVs. Harrison stated that PELs and TLVs do not completely and adequately protect workers and their offspring from reproductive harm. This is in part because chemicals with PELs and TLVs are not used in clean rooms in isolation but instead are used in conjunction with other chemicals that together cause genetic damage to workers' future offspring. Also, "[r]eproductive and other latent outcomes are usually not the basis for setting exposure limits."

¶ 25    Harrison concluded that Motorola's "facilities and work practices were improper and did not meet the appropriate standard of care within the industry or within the occupational medicine community. Motorola did not provide a safe place to work or the measures to protect the Employee Parents from harm to their future offspring."

¶ 26    Harrison subsequently issued a supplemental report, in which he concluded that Armando's exposures to carbon tetrachloride, PGMEA, HMDS, and isopropyl alcohol were sufficient to pose a risk of reproductive harm to Fernandez. Motorola failed to warn or adequately train Armando

about the reproductive dangers associated with the chemicals to which he was exposed. Motorola also did not provide Armando with sufficient protective gear.

¶ 27    Harrison was deposed, and he testified consistently with his reports. Harrison stated that there were scientific studies as early as the 1970s and 1980s showing that paternal exposure to organic solvents caused birth defects in future offspring. Harrison specifically cited a publication from OSHA in 1979, a study performed by Dr. Wharton in 1982, and a paper published in the Journal of the American Medical Association (JAMA) in 1985. According to Harrison, the majority of the peer-reviewed scientific literature as of 1991 found a causal connection between a father's exposure to toxic substances and the subsequent birth defects in his offspring.

¶ 28    Motorola confronted Harrison with a 1989 scientific study authored by A.D. McDonald and J.C. McDonald, who were members of a nonprofit scientific research organization in Quebec. The McDonald study examined the correlation between a father's employment in various occupations and pregnancy outcome. Pertinent here, the authors examined whether workers in the manufacturing sector who were involved in the fabricating, inspecting, assembling, installing, and repairing of electronic equipment had a higher incidence of offspring born with birth defects. The authors concluded that there was no correlation between the fathers' occupation in the manufacturing sector and "any adverse effect on their progeny." Harrison was critical of the McDonald study.

¶ 29    Fernandez filed a "joint causation report" (joint report) prepared by four medical experts with different specialties: Dr. Cynthia Bearer (neonatology), Dr. Donald Mattison (obstetrics-gynecology), Dr. Richard Finnell (genetics), and Dr. Robert Cabrera (genetics). The joint report addressed causation in the multiple personal injury cases against Motorola pending in the circuit court of Cook County.

¶ 30     The joint report discussed a 1992 study from the SIA and a 1993 study from IBM identifying reproductive toxins commonly used during the semiconductor manufacturing process. In pertinent part, the SIA study identified nitric acid, hydrofluoric acid, HMDS, and PGMEA as reproductive toxins; the IBM study identified arsenic, arsine gas, hydrofluoric acid, HMDS, and isopropyl alcohol. Harrison testified that the SIA and IBM studies were well known within the semiconductor industry "long before their results were announced."

¶ 31     The joint report also discussed a 2008 report authored by Ching-Chun Lin and his colleagues at the Institute of Occupational Medicine and Industrial Hygiene (Lin report), which looked at lethal birth defects in the offspring of male semiconductor workers from 1980 to 1994. The Lin report concluded that the children of male semiconductor workers were at increased risk of birth defects, congenital heart anomalies, and death due to their fathers' exposure to chemicals associated with reproductive toxicity, including ethylene glycol ethers and hydrofluoric acid. The Lin report posited that, when such chemicals were absorbed into the seminal fluid, intercourse during pregnancy could lead to maternal systemic absorption of the chemicals and eventual birth defects in the developing fetus.

¶ 32     The joint report cited other epidemiological studies showing that paternal exposure to organic solvents in the semiconductor industry (such as carbon tetrachloride, NMP, and PGMEA) is associated with birth defects. These associations "are due to a direct effect on gametic DNA, *i.e.* the DNA inside sperm, but, an indirect effect is also possible in humans, as toxicants are also transmitted to the mother from contaminated clothing or via seminal fluid." Also, arsenic, an endocrine-disrupting chemical used in the semiconductor industry, "can produce damage to offspring, indirectly through genetic or epigenetic changes in sperm."

¶ 33    The joint report concluded that the workplace exposure to toxic chemicals and substances in Motorola's semiconductor manufacturing facilities has "the capacity to cause the adverse reproductive outcomes experienced by the offspring Plaintiffs. Moreover, the exposures in question were plainly sufficient to cause these injuries."

¶ 34    Fernandez filed a supplemental report from Bearer, Mattison, Finnell, and Cabrera noting Stewart's findings regarding Armando's exposures to, among other toxic substances, carbon tetrachloride, hydrofluoric acid, NMP, PGMEA, HMDS, and arsine gas. The supplemental report concluded that Armando's "substantial occupational exposures to geotoxic and reproductively toxic chemicals at Motorola without adequate protections caused" Fernandez's birth defects. The supplemental report ruled out any theoretical alternative explanations for Fernandez's injuries.

¶ 35    Asanga Weerakoon, who held engineering and management positions at Motorola, testified in his deposition that, by 1982, Motorola knew of studies indicating that arsenic and arsine gas could affect both the male and female reproductive systems.

¶ 36    Mike May, the certified industrial hygienist who worked for Motorola, testified that, as early as 1982, Motorola was aware of studies indicating that carbon tetrachloride had "paternal reproductive effects." May further testified that Motorola had a duty to provide a safe workplace for its employees and their unborn children to the best of its ability.

¶ 37    Following discovery, Motorola moved for summary judgment on Fernandez's complaint. The circuit court granted the motion, finding that Motorola owed Fernandez no duty of care under Texas law and therefore that her negligence and willful and wanton counts fail. In light of its grant of summary judgment in favor of Motorola on the willful and wanton count, the circuit court also denied Fernandez's motion to amend the complaint to allege punitive damages. Fernandez appeals.

¶ 38 Initially, Fernandez argues that, under the law of the case doctrine and *stare decisis*, our holding in *Ledeaux I*, 2018 IL App (1st) 161345, regarding the existence of a duty on the part of Motorola was binding on the circuit court. The law of the case doctrine prohibits reconsideration of issues that have been decided in a prior appeal in the same case. *In re Christopher K.*, 217 Ill. 2d 348, 365 (2005). The purpose of the law of the case doctrine is to protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effectuate proper administration of justice, bring litigation to an end, and maintain the prestige of the courts. *Norris v. National Union Fire Insurance Co. of Pittsburgh*, 368 Ill. App. 3d 576, 581 (2006). The doctrine of *stare decisis* requires a court to follow the decisions of higher courts on the issue before it. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008).

¶ 39 *Ledeaux I* did not involve the same issue in the same case as here, and therefore neither the law of the case doctrine nor *stare decisis* applies. *Ledeaux I* involved the combined fourth amended complaint filed against Motorola by multiple plaintiffs seeking recovery for their birth defects. *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 11. Marcus Ledeaux and his parents were listed first in the case caption, but their claims were not before this court on appeal. Instead, the appeal involved review of the circuit court's order dismissing only Hardison's and Finzer's claims under section 2-615 of the Code. *Id.* ¶¶ 10-12. We reversed the dismissal of their negligence and willful and wanton conduct claims and remanded. In so holding, we took all their well-pleaded allegations as true, as required when deciding a section 2-615 motion (*id.* ¶ 14), and found that each claim sufficiently alleged a duty owed to them by Motorola. *Id.* ¶¶ 39, 49.

¶ 40 By contrast, the instant case involved the disposition of Fernandez's claims against Motorola for negligence and willful and wanton misconduct, not Hardison's and Finzer's claims.

The instant case also involved the resolution of Motorola's summary judgment motion, which unlike the section 2-615 motion at issue in *Ledeaux I*, did not require the circuit court to take all well-pleaded allegations in Fernandez's complaint as true. Rather, the circuit court was required to look at the evidentiary record outside the complaint and determine whether there were any genuine issues of material fact and whether Motorola owed Fernandez a duty as a matter of law. See 735 ILCS 5/2-1005(c) (West 2020). As the parties, procedural posture, and issues in *Ledeaux I* were dissimilar to the instant case and *Ledeaux I* did not involve the rendering of a decision as to whether Motorola was entitled to summary judgment against Fernandez's claims, neither the law of the case doctrine nor *stare decisis* applies.

¶ 41 We proceed to address the merits of Fernandez's appeal. First, Fernandez argues that the circuit court erred by granting summary judgment for Motorola on her negligence claim. The parties agree that Illinois law governs the procedural issues in this case, such as the applicable standard for when summary judgment may be granted. In Illinois, summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 38. Review is *de novo*. *Id.*

¶ 42 The parties also agree that we are to apply Texas law to the substantive issues (such as whether the circuit court erred in finding that Motorola owed Fernandez no duty of care). In Texas, the elements of a common-law negligence claim are a legal duty owed by the defendant to the plaintiff, the defendant's breach of that duty, and damages proximately caused by the breach. *Elephant Insurance Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). The existence of a duty is a

question of law for the court to decide. *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

¶ 43 To determine whether a duty exists under Texas law, the court considers the risk, foreseeability, and likelihood of injury weighed against the social utility of defendant's conduct, whether defendant had superior knowledge of the risk, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on defendant. *Elephant Insurance Co.*, 644 S.W.3d at 145. The foreseeability of the risk is the foremost consideration. *Phillips*, 801 S.W.2d at 525. Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others. *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 460 (Tex. App. 2007).

¶ 44 The Texas Supreme Court uses a two-prong test for foreseeability: (1) that the injury be of such a general character as reasonably might have been anticipated and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or one similarly situated reasonably might have been foreseen. *Id.* (citing *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999) (plurality opinion)). " 'Stated more broadly, we determine both the foreseeability of the general danger and the foreseeability that a particular plaintiff—or one similarly situated— would be harmed by that danger.' " *Id.*

¶ 45 The circuit court found as a matter of Texas law that Fernandez failed to meet the foreseeability element of her negligence claim. For the reasons that follow, we find that the evidence of record raises a question of material fact as to whether Fernandez's birth defects were the reasonably foreseeable consequence of Motorola's alleged negligence. This question of material fact cannot be determined as a matter of law but must be resolved by the trier of fact in order to determine whether a duty existed.

¶ 46    As we discussed earlier in this opinion, Fernandez's environmental health engineering expert James Stewart reported that, while Armando worked in Motorola's semiconductor manufacturing plant in Texas, he was exposed to carbon tetrachloride, hydrofluoric acid, nitric acid, arsenic, arsine gas, isopropyl alcohol, NMP, HMDS, and PGMEA. All of these chemicals and gas were identified in the joint report (and the epidemiological studies cited therein), the Lin report, and in the SIA and IBM studies as being reproductively toxic, *i.e.*, as having the potential to cause birth defects in future offspring. Harrison, May, and Weerakoon's testimony indicated that Motorola was aware of these studies and/or their findings and also was aware of other studies showing that a father's exposure to such reproductively toxic chemicals caused birth defects in his future offspring.

¶ 47    Fernandez argues that, given Motorola's awareness of studies linking birth defects with paternal exposure to toxic chemicals, it reasonably could have foreseen her birth defects resulting from Armando's exposures here.

¶ 48    Motorola points to some contrary evidence conflicting with the joint report, the Lin report, and the IBM and SIA studies and calling into question the foreseeability of Fernandez's birth defects. Specifically, Motorola cites the McDonald study, which found "no convincing evidence" linking paternal employment in the manufacturing sector, including inspecting, fabricating, and repairing electrical equipment (such as wafers), with subsequent birth defects in future offspring. Harrison testified to his awareness of the McDonald study but opined that it represented a minority view in conflict with the majority of peer-reviewed literature that found that paternal exposure to the type of toxins utilized in the manufacture of semiconductors was linked to offspring's subsequent birth defects.

¶ 49    Given this conflict in the scientific evidence, there is a question of material fact regarding whether paternal exposure to reproductive toxins utilized in the manufacture of semiconductors causes birth defects and, thus, whether Motorola reasonably could have foreseen Fernandez's birth defects resulting from Armando's workplace exposures to the toxic chemicals and gas at issue here. This question of material fact must be resolved by the trier of fact prior to any finding as to the existence of a duty under Texas law.

¶ 50    Next, we consider Fernandez's argument that Motorola owed her a duty of care under the Restatement (Second) of Torts § 324A (1965), which was adopted by the Texas Supreme Court in *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837-38 (Tex. 2000). Section 324A states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm[.]"
> Restatement (Second) of Torts, § 324A (1965).

¶ 51    Fernandez argues that, by developing a reproductive health policy, Motorola undertook a duty to render services to its employees, including her father Armando, necessary for the protection of their future offspring. According to Fernandez's experts, though, Motorola's attempts at such a reproductive health policy were incomplete, confusing, and ineffective. Fernandez argues that Motorola's failure to exercise reasonable care in formulating the reproductive health policy actually increased the risk of harm to her by giving Armando a false sense of safety that encouraged him to continue to expose himself to the toxic chemicals and gas that ultimately caused her birth

defects. As such, Fernandez contends that Motorola is subject to liability to her under section 324A.

¶ 52    Motorola's duty under section 324A is contingent on a finding that its allegedly negligent reproductive health policy led to Armando's exposure to toxic chemicals and gas that increased the risk that Fernandez would suffer birth defects. As already noted, though, the scientific evidence in this case is conflicting as to whether paternal exposure to toxic chemicals during the manufacturing of semiconductors causes future offspring to be born with birth defects. Such conflicting scientific evidence raises a genuine issue of material fact as to whether Motorola's allegedly negligent reproductive health policy actually increased Fernandez's risk of birth defects so as to subject it to liability under section 324A.

¶ 53    Motorola further argues that the additional factors in the duty analysis under Texas law (the risk and likelihood of injury weighed against the social utility of Motorola's conduct, the magnitude of guarding against the injury, and the consequences of placing the burden on Motorola) all support the circuit court's finding that Motorola owed Fernandez no duty here. To the contrary, the conflicting scientific evidence cited above raises questions of material fact as to the risk and likelihood that Armando's exposure to the toxic chemicals and gas at issue here would cause Fernandez's subsequent birth defects.

¶ 54    There are also questions of material fact as to the cost and feasibility of Harrison's proposed recommendations as to how Motorola should guard against injuries to its workers' children who have not yet even been conceived. Such recommendations include investigating the chemical substances used at Motorola and substituting less hazardous material when possible, providing proper personal protective equipment and sufficient ventilation, training its workers about the reproductive risks associated with the chemicals used in the manufacture of semiconductors, and

providing its workers with alternative jobs that would lessen their exposures to the toxic chemicals. Fernandez asserts that the recommended changes would come at "no great cost," while Motorola counters that the magnitude and consequences of guarding against reproductive injuries to its employees' unborn (and not yet even conceived) offspring could result in the alteration of the manufacturing process, causing thousands of job losses and slowing down the speed and quality of production. Neither party has cited any evidence in support of their respective arguments as to the cost of remediating chemical exposures, and thus questions of material fact remain as to the magnitude and consequences of placing the remediation burden on Motorola.

¶ 55     An additional consideration in the duty analysis under Texas law is whether Motorola had superior knowledge of the risk that Armando's exposure to the toxic chemicals and gas at issue here could result in Fernandez's subsequent birth defects. Given the conflicting scientific evidence regarding the link between paternal exposure to toxic chemicals during the manufacturing of semiconductors and the subsequent conception and birth of a child with birth defects, a genuine issue of material fact exists regarding the state of Motorola's knowledge of the reproductive risks associated with Armando's exposures.

¶ 56     Motorola argues that under Texas law there can be no duty owed for injury-causing conduct that occurred prior to conception, as such a duty would be "expansive" and "unworkable," potentially subjecting it to liability for damages that will not be suffered until many years in the future. We addressed this same issue in *Ledeaux I*,[1] and we agree with its holding that fundamental tort law in Texas "does not prohibit imposing liability on a tortfeasor for conduct that causes an

---

[1]Although we are not bound to follow *Ledeaux I* under the doctrines of *stare decisis* and law of the case, we may consider the analysis contained therein for its persuasive value.

injury regardless of whether that conduct occurred pre-conception and the resulting injury manifested after the child's conception and birth." *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 38. "To preclude a cause of action for negligence based solely on the fact that the negligence occurred before plaintiffs' conception would leave a party with no recourse for injuries caused by another," which is contrary to Texas law. *Id.* ¶ 39.

¶ 57 Motorola argues, though, that we should affirm the summary judgment order in its favor because the Texas workers' compensation statute (Tex. Lab. Code Ann. §§ 401.001 to 419.027 (West 2022)) provides the exclusive remedy for a work-related injury sustained by an employee. See *id.* § 408.001(a). Motorola acknowledges that Fernandez was not one of its employees, but it argues that, according to her complaint, she would not have suffered the birth defects in the absence of Armando's workplace exposure to the toxic chemicals and gas, which affected his testes and sperm and constituted a workplace injury covered under the Texas workers' compensation statute. See *id.* § 401.011 (defining " 'Injury' " as "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm."). As such, Motorola contends that Fernandez's negligence claims are derivative of Armando's workplace injury and can only be brought under the Texas workers' compensation statute. See *Aguirre v. Vasquez*, 225 S.W.3d 744, 753 (Tex. App. 2007) (holding that actions based on injuries derivative of an employee's workplace injury cannot be pursued outside the workers' compensation system).

¶ 58 We addressed this same issue in *Ledeaux I*, where we noted that under Texas law the type of derivative claims that must be brought under the Texas workers' compensation statute are those where the plaintiff was not physically injured herself but suffered emotional or economic harm due to the physical injury to the employee, *e.g.*, claims for loss of consortium or wrongful death. *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 20 (citing *Rodriguez v. Naylor Industries, Inc.*, 763 S.W.2d

411, 412 (Tex. 1989)). In the instant case, Fernandez seeks recovery for her *own* injuries (the severe birth defects suffered by her) separate and apart from any workplace injury to Armando. As such, the exclusive remedy provision of the Texas workers' compensation statute does not apply here.

¶ 59    Motorola next argues that we should affirm the summary judgment order in its favor because none of Fernandez's experts specifically opined that her birth defects were proximately caused by Armando's workplace exposures to toxic chemicals and gas. To the contrary, the supplemental report prepared by Bearer, Mattison, Finnell, and Cabrera specifically found that Fernandez's particular birth defects were proximately caused by Armando's workplace exposure to the toxic chemicals and gas at issue here. As discussed earlier in this opinion, there was a contrary study from McDonald calling into question whether a father's exposure to toxic chemicals and gases during the manufacturing of semiconductors can cause his future offspring to suffer birth defects. Such a conflict in the evidence raises a question of material fact that must be resolved by the trier of fact.

¶ 60    Accordingly, we reverse the order granting summary judgment for Motorola on Fernandez's negligence count and remand for further proceedings.

¶ 61    Next, we address the grant of summary judgment for Motorola on Fernandez's willful and wanton conduct count. In Texas, willful and wanton misconduct is recognized as a form of aggravated or gross negligence. *Id.* ¶ 48 (citing *BP Oil Pipeline Co. v. Plains Pipeline, L.P.*, 472 S.W.3d 296, 312 (Tex. App. 2015)). To prove aggravated or gross negligence, *i.e.*, willful and wanton misconduct, plaintiff must establish the elements of negligence (duty, breach, and proximate cause) along with facts establishing that the negligent conduct created an extreme risk of harm to others and that the defendant knew of the extreme risk but proceeded anyway. *Id.* ¶ 49

(citing *Columbia Medical Center of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008), and *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d 778, 784-86 (Tex. 2001)).

¶ 62    Here, the circuit court granted summary judgment for Motorola on Fernandez's willful and wanton conduct count on the basis that it owed no duty toward her as a matter of law. We already have found that questions of material fact exist regarding the foreseeability of Fernandez's birth defects, which must be resolved prior to determining whether Motorola owed her a duty of care. Given these questions of material fact regarding the existence of Motorola's duty toward Fernandez, we reverse the grant of summary judgment for Motorola on Fernandez's willful and wanton conduct count and remand for further proceedings.

¶ 63    Finally, we address the circuit court's order denying Fernandez leave to amend her complaint to add a claim for punitive damages. In Texas, exemplary (punitive) damages may be awarded where the claimant proves gross negligence (willful and wanton misconduct). See Tex. Civ. Prac. & Rem. Code Ann. § 41.001 (West 2022) (defining " '[e]xemplary damages' " as including punitive damages); *id.* § 41.003 (providing that exemplary damages may be awarded upon a clear and convincing showing of gross negligence). The circuit court here determined that, because it granted summary judgment in favor of Motorola on the willful and wanton conduct count, Fernandez had no basis for an assertion of punitive damages. As we are reversing the order granting summary judgment for Motorola on the willful and wanton conduct count and remanding for further proceedings, the court's stated basis for denying Fernandez leave to amend her complaint to add a claim for punitive damages no longer exists. Accordingly, we reverse the order denying Fernandez leave to amend her complaint and remand for reconsideration thereof.

¶ 64                                    II. Johnson

¶ 65    Johnson was born on May 3, 1994, with Apert syndrome, a genetic disorder causing severe craniofacial deformities, intellectual disability (first-grade comprehension level), bilateral fusion of fingers and toes, and severe speech impediment. Johnson has undergone more than 90 surgeries including craniofacial procedures and orthopedic procedures on both hands and feet. Johnson filed a complaint alleging that his Apert syndrome resulted from Motorola's negligence and willful and wanton misconduct in exposing his father, Norman, to reproductively toxic chemicals in the workplace.

¶ 66    During discovery, Norman testified that he worked at Motorola's Texas facility from 1986 to November 1993 in the advanced product research and development department, where new processes and products for manufacturing semiconductors were developed. Norman was a section manager responsible for overseeing the photolithography and etch bays, where he was exposed to various chemicals and solvents, including hydrofluoric and sulfuric acids and acetone and isopropyl alcohol. Norman also spent time in the ion implantation bay. Ion implantation is a doping method used in semiconductors that introduces impurities into a semiconductor wafer, enabling conductivity. Norman did not remember receiving any formal safety training while at Motorola, nor did he remember anyone at Motorola warning him that his exposures to the chemicals in the etch, photolithography, and ion implantation bays could lead to birth defects in his future offspring.

¶ 67    In 1993, Norman's wife, Janice, lived in Arizona while he worked in Texas. Norman visited Janice on the weekends. During one of those weekend visits in August 1993, they conceived Johnson, who was born in May 1994 with Apert syndrome. Norman had no knowledge of any prior birth defects in his or Janice's extended family.

¶ 68    Stewart, the environmental health engineering expert, filed a report stating that Norman would have been exposed to the following chemicals and solvents while working as a section

manager in the photolithography, etch, and ion implantation bays: HMDS, NMP, acetone, PGMEA, carbon tetrachloride, hydrofluoric acid, isopropyl alcohol, arsenic, and glycol ethers. The joint report and the IBM and SIA studies identified all these chemicals and solvents as being reproductively toxic.

¶ 69    Harrison, the occupational health physician, filed a report stating that all these chemicals exerted synergistic and/or additive adverse reproductive effects on Norman, sufficient to pose a risk of reproductive harm to Johnson. Harrison opined that Motorola failed to adequately warn Norman about the reproductive risks posed by his chemical exposures and did not provide him with adequate protective gear.

¶ 70    Bearer, Mattison, Finnell, and Cabrera filed a supplemental report stating that Apert syndrome is paternal in origin and caused by a *de novo* mutation in the father's sperm, leading to a variant in the child's FGFR2 gene. They concluded that Norman's occupational exposures to reproductive toxins caused the *de novo* mutation in his sperm and were a "substantial factor and proximate cause" of Johnson being born with Apert syndrome. The supplemental report ruled out any alternative explanation for Johnson's birth defects.

¶ 71    Following discovery, Motorola moved for summary judgment on Johnson's complaint based on lack of duty. The circuit court found that Texas law governed the substantive issues, while Illinois law governed the procedural issues. The court granted the summary judgment motion and denied Johnson's motion to amend the complaint to allege punitive damages. Johnson appeals.

¶ 72    First, Johnson argues that the circuit court erred by finding that the substantive law of Texas applies to his case; he takes no issue with the court's ruling that Illinois law controls all procedural issues.

¶ 73    Illinois follows the Restatement (Second) of Conflict of Laws in making choice-of-law decisions. *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 60-61 (2007). Section 146 of the Restatement (Second) of Conflict of Laws states that "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties," unless another state has a "more significant relationship" to the occurrence and the parties, in which event the local law of the other state will be applied. Restatement (Second) of Conflict of Laws § 146 (1971). In determining which state has a more significant relationship, we consider four factors: the place where the injury occurred; the place where the injury-causing conduct occurred; the domicil, residence, nationality, place of incorporation, and place of business of the parties; and the place where the relationship between the parties is centered. *Id.* § 145(2). The circuit court's choice-of-law determination is reviewed *de novo*. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 153 (2007).

¶ 74    Johnson argues that his injuries here did not occur until he was born with Apert syndrome in Arizona and, thus, that the circuit court should have applied Arizona substantive law to his claims. However, Johnson ignores the other factors in the choice-of-law analysis, all of which support the circuit court's application of Texas substantive law.

¶ 75    Specifically, we must consider "where the conduct causing the injury occurred." Restatement (Second) of Conflict of Laws § 145(2) (1971). The injury-causing conduct allegedly occurred in Texas, when Norman was exposed to various reproductively toxic chemicals while working as a section manager in Motorola's semiconductor manufacturing plant located in Austin. Norman's exposure allegedly led to a mutation in his sperm, which subsequently caused Johnson to be born with Apert syndrome.

¶ 76    We also must consider the place of business of the parties. *Id.* The pertinent place of business was in Texas, where at the time of his chemical exposures, Norman worked in Motorola's semiconductor manufacturing plant located in Austin.

¶ 77    Finally, we consider where the relationship of the parties is centered. *Id.* The relationship was centered in Texas, the site of Norman's employment with Motorola and the locus of his chemical exposures.

¶ 78    Section 145 of the Restatement provides that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* § 145. Here, the particular issue is whether Motorola reasonably could have foreseen Johnson's injuries resulting from Norman's exposure to reproductively toxic chemicals at the semiconductor facility in Texas. Resolution of this issue requires consideration of the specific chemicals Norman was exposed to, whether they were of a type that causes genetic damage to sperm resulting in birth defects (Apert syndrome) in future offspring, Motorola's knowledge thereof, the steps Motorola took to prevent or lessen those exposures, and any warnings or protective equipment provided to Norman. All these considerations require the trier of fact to look primarily to where the injury-causing conduct occurred in order to determine Norman's type of exposure and Motorola's knowledge thereof, as well as any preventive measures taken. The injury-causing conduct occurred in the Texas semiconductor facility; therefore, on the facts of this case, Texas has the most significant relationship to the occurrence and the parties. We determine that the balance of the relevant choice-of-law factors favors the application of Texas substantive law to Johnson's claims.

¶ 79    We turn to the merits of Johnson's appeal.

¶ 80    The parties rehash the same arguments we addressed earlier in this opinion in the Fernandez appeal regarding law of the case, *stare decisis*, the exclusive remedy provided by the

Texas workers' compensation statute, and the feasibility of allowing recovery for preconception torts. In accordance with our analysis in the Fernandez appeal, we reject Johnson's arguments that the law of the case and *stare decisis* require us to follow the reasoning of *Ledeaux I* in its duty analysis, where that case involved different parties and a different procedural posture than the one here. We reject Motorola's argument that Johnson's claims may only be redressed under the Texas workers' compensation statute, where he is seeking recovery for his own injuries and not those of his father. We find that Texas law allows for the recovery of damages for preconception torts, where those torts have been proven by competent evidence.

¶ 81    Also, for the reasons discussed earlier in this opinion, we reverse the grant of summary judgment for Motorola on Johnson's claims of negligence and willful and wanton misconduct and the denial of his motion to add a claim for punitive damages. The conflict in the scientific evidence regarding whether paternal exposure to reproductive toxins causes birth defects (such as Apert syndrome) and, thus, whether Johnson's birth defects were reasonably foreseeable by Motorola, raises questions of material fact that must be resolved by the trier of fact prior to any finding as to the existence of a duty, proximate cause, and punitive damages. The trier of fact also must resolve questions of material fact regarding the magnitude of guarding against Johnson's injury here and the consequences of placing that burden on Motorola.

¶ 82    We affirm the order granting summary judgment on Johnson's parents' claim for parental loss of child consortium, as such a claim is not recognized under Texas law. See *Ledeaux I*, 2018 IL App (1st) 161345, ¶ 51 (citing *Roberts v. Williamson*, 111 S.W.3d 113, 120 (Tex. 2003)).

¶ 83                                    III. Conclusion

¶ 84    In case number 1-22-0884, we reverse the order granting summary judgment for Motorola on Fernandez's negligence and willful and wanton conduct counts and denying her leave to amend her complaint to add a claim for punitive damages and remand for further proceedings.

¶ 85    In case number 1-22-0892, we reverse the order granting summary judgment for Motorola on Johnson's negligence and willful and wanton conduct counts and denying him leave to amend the complaint to add a claim for punitive damages and remand for further proceedings. We affirm the grant of summary judgment in favor of Motorola on Johnson's parents' claim for parental loss of child consortium.

¶ 86    No. 1-22-0884, Reversed and remanded.

¶ 87    No. 1-22-0892, Affirmed in part, reversed in part, and remanded.

---

***Fernandez v. Motorola Solutions, Inc.*, 2024 IL App (1st) 220884**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos, 19-L-10156, 10-L-7695; the Hon. Irwin J. Solganick, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael J. Lubeck and Kevin J. Conway, of Cooney & Conway, of Chicago, and Michael T. Reagan, of Ottawa, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | J. Hayes Ryan and Todd M. Murphy, of Gordon Rees Scully Mansukhani, and Karen Kies DeGrand, Scott L. Howie, Laura Coffey Ieremia, and Katie B. Trucco, of Donohue Brown Mathewson & Smyth LLC, both of Chicago, for appellee. |

---